The STATE of Ohio, Appellee,

v.

CHRZANOWSKI, Appellant.

[Cite as *State v. Chrzanowski*, 180 Ohio App.3d 324, 2008-Ohio-6993.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

No. 2008-P-0001.

Decided Dec. 31, 2008.

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Pamela J. Holder, Assistant Prosecuting Attorney, for appellee.

Jeffrey J. Holland, for appellant.

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellant, Andrew M. Chrzanowski, appeals the judgment of the Portage County Municipal Court, Ravenna Division, denying his motion to suppress. For the reasons that follow, we affirm.

{¶ 2} On May 17, 2007, at about 1:47 a.m., Trooper Jonathon Ganley of the Ohio State Highway Patrol, while on routine patrol, was driving his cruiser southbound on State Route 44 in Rootstown Township, Portage County, a two-lane road, when he saw a vehicle with its headlights on stopped partially in the northbound lane of Route 44. The trooper slowed down his cruiser and saw a person standing outside the vehicle.

{¶ 3} Trooper Ganley testified that the vehicle stopped in the road presented a public safety concern because it could have had mechanical problems or its driver could have had a medical condition. Further, he said that drivers of other cars

would not expect to come upon a vehicle stopped in the road, and this situation could cause a crash. Deciding "to investigate and make sure everything was okay," Trooper Ganley turned around in a driveway and headed north toward appellant's vehicle. Appellant then drove his vehicle into an adjacent private driveway. The trooper parked his cruiser in the berm near the end of the driveway below appellant's vehicle. He testified that he parked his cruiser there for his safety. He said this is how he would have parked if appellant's vehicle still had been stopped in the road as it initially was.

{¶ 4} As Trooper Ganley exited his cruiser, appellant left his vehicle and stood outside his car. The passenger who was originally outside appellant's vehicle was still outside. The trooper walked over to appellant, and they began talking. The passenger walked over and joined them in their conversation.

{¶ 5} Trooper Ganley asked appellant why he had been stopped in the road. The trooper learned that there were six passengers in appellant's vehicle, although it was equipped with only five safety belts, and that two of the occupants were fighting.

{¶ 6} Trooper Ganley testified that he noticed an odor of alcohol coming from appellant's general area. His eyes were glassy and red. Appellant was swaying, and his speech was slurred. He said that he was coming from a nearby bar, which was about one mile away, and that he had had a few drinks before driving.

{¶ 7} The trooper then walked appellant to his cruiser to separate him from the others to determine whether the odor of alcohol was coming from him. While they were both in the front seat of the cruiser, the trooper smelled alcohol coming from appellant. He submitted to a portable breathalyzer test ("PBT"), which resulted in a reading of .090.

{¶ 8} Trooper Ganley testified that he is trained in detecting and apprehending alcohol-impaired drivers and is certified to administer field-sobriety tests. He administered the horizontal-gaze-nystagmus, one-leg stand, and walk-and-turn field sobriety tests, and appellant failed each test. The trooper then arrested appellant for operating a vehicle under the influence of alcohol. He gave appellant his *Miranda* rights and placed him in the rear of his cruiser. Trooper Ganley transported appellant to the Ravenna post.

{¶ 9} While driving to the post, appellant said that when they arrived at the post, he would need to use the bathroom. The trooper said he would have to wait until appellant decided to either take the breathalyzer test or refuse to take it because he needed to keep appellant under observation before administering the test. Appellant took the breathalyzer test, and the results indicated a blood alcohol concentration of .089, which is above the legal limit.

{¶ 10} Appellant was charged with two counts of operating a vehicle under the influence of alcohol ("OVI"), misdemeanors of the first degree, in violation of R.C. 4511.19(A)(1)(a) and (d). Appellant pleaded not guilty and moved to suppress any statements made to the trooper as being in violation of his *Miranda* rights and the breathalyzer results as being coercive and not in compliance with regulations regarding refrigeration of the breathalyzer solution.

{¶ 11} On October 1, 2007, a suppression hearing was held. In overruling appellant's motion, the trial court made the following findings:

{¶ 12} "The court finds that the trooper properly performed an investigative stop. It is generally held that an officer on routine patrol is lawfully entitled to approach and investigate occupants of a stationary vehicle, particularly when there is an issue of public safety, as in the instant case. The Trooper's placement of his vehicle was a safety consideration and not an arrest triggering *Miranda* rights and therefore was not violative of Defendant's constitutional rights.

{¶ 13} "Further, the Court finds that the Trooper conducted the field sobriety tests in substantial compliance with NHTSA standards. Further, the Court finds that the Trooper had probable cause to arrest Defendant for Operating a Vehicle Under the Influence, based on the totality of circumstances, including the odor of alcohol about Defendant's person, red eyes, swaying, admission to consumption of alcohol, time of day, Defendant's poor performance on field sobriety tests, and results of the PBT.

{¶ 14} "The Court further finds that the Trooper's policy regarding Defendant's use of the restroom was reasonable given the statutory time frames and observation requirements for the breathalyzer analysis, and that Defendant's submission to the test was not coerced.

{¶ 15} "The Court further finds that the burden on the State to show substantial compliance with [Ohio Department of Health ("ODH") ] testing regulations is minimal, and basic testimony can satisfy that burden. In the instant case the Trooper provided competent credible evidence that the State complied with ODH regulations regarding refrigeration of the breathalyzer solution."

{¶ 16} On January 3, 2008, appellant withdrew his not-guilty plea and pleaded no contest to one count of OVI, in violation of R.C. 4511.19(A)(1)(d). The state dismissed the remaining charge. The court found appellant guilty and sentenced him to a $1,000 fine with $650 suspended, 180 days in jail with 177 days suspended, and six months of license suspension. The trial court stayed the execution of sentence pending appeal. Appellant filed a timely notice of appeal asserting as his sole assignment of error:

{¶ 17} "The trial court erred by denying appellant's motion to suppress where appellant was arrested without probable cause; interrogated without a knowing,

intelligent waiver of his Miranda rights; given field sobriety tests which were not conducted in substantial compliance with National Highway Traffic Safety Administration standards; coerced into taking a breath test; and where the breath test was not conducted in substantial compliance with Ohio Department of Health regulations."

{¶ 18} Appellate review of a trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. During a hearing on a motion to suppress evidence, the trial judge acts as the trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. An appellate court reviewing a motion to suppress is bound to accept the trial court's findings of fact when they are supported by competent, credible evidence. *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726. Accepting these facts as true, the appellate court independently reviews the trial court's legal determinations de novo. *State v. Djisheff*, 11th Dist. No. 2005-T-0001, 2006-Ohio-6201, 2006 WL 3393344, at ¶ 19.

{¶ 19} Appellant raises five issues under his assignment of error. First, he argues that his arrest was made without probable cause. Appellant does not dispute that the trooper ultimately had enough information to satisfy the probable-cause requirement. Instead, he argues that because the trooper parked his cruiser behind his vehicle, he was "effectively under arrest," and all evidence obtained as a result should have been suppressed.

{¶ 20} A stop is constitutional if it is supported by either a reasonable suspicion or probable cause. *Ravenna v. Nethken*, 11th Dist. No. 2001-P-0040, 2002-Ohio-3129, 2002 WL 1357782, at ¶ 28–31. "[T]he concept of an investigative stop allows a police officer to stop an individual for a short period if the officer has a reasonable suspicion that criminal activity has occurred or is about to occur." *State v. McDonald* (Aug. 27, 1993), 11th Dist. No. 91–T–4640, 1993 WL 334223, *4. " 'In justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which would warrant a man of reasonable caution in the belief that the action taken was appropriate.' " Id., quoting *State v. Klein* (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141. "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " *United States v. Brignoni–Ponce* (1975), 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607, quoting *Terry v. Ohio* (1968), 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889. "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain

information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty* (1984), 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶ 21} Because the determination of whether an officer had reasonable suspicion depends on the specific facts of the case, the Ohio Supreme Court has consistently held that the propriety of such a stop "must be viewed in light of the totality of the surrounding circumstances." *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of the syllabus.

■ {¶ 22} Further, it is well established that a police officer can stop a motorist if he has a suspicion that the driver may be in need of assistance. "While Terry and much of its progeny stand for the proposition that a police officer generally needs a reasonable suspicion, based on specific and articulable facts, that an occupant of a vehicle is or has been engaged in criminal activity, nothing in the Fourth Amendment requires that the 'specific and articulable facts' relate to suspected criminal activity. Were we to insist that every investigative stop be founded on such suspicion, we would be overlooking the police officer's legitimate role as a public servant designed to assist those in distress and to maintain and foster public safety. That is, law enforcement officers may legitimately approach persons and vehicles for purposes other than criminal investigation." *State v. Norman* (1999), 136 Ohio App.3d 46, 53, 735 N.E.2d 953, citing *Cady v. Dombrowski* (1973), 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706. In *Cady,* the United States Supreme Court held:

{¶ 23} "Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers * * * frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441, 93 S.Ct. 2523, 37 L.Ed.2d 706.

■ {¶ 24} Thus, under appropriate circumstances, a police officer will be justified in approaching a vehicle to provide assistance, without needing any reasonable basis to suspect criminal activity. "Police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out 'community caretaking functions' to enhance public safety. The key to such permissible police action is the reasonableness required by the Fourth Amendment. When approaching a vehicle for safety reasons, the police officer must be

able to point to reasonable, articulable facts upon which to base [his or] her safety concerns." *Norman*, 136 Ohio App.3d at 54, 735 N.E.2d 953.

{¶ 25} This court recognized this obligation on the part of police officers in *State v. Pelsue* (May 23, 1997), 11th Dist. No. 95–P–0149, 1997 WL 286174. In that case, the officer observed a truck parked in the road. The engine was running, and its headlights were illuminated, but the vehicle remained stationary. Concerned that this was a disabled vehicle, the officer pulled alongside the truck to inquire whether he could be of assistance. This court held that when the officer asked whether the driver needed assistance, he acted reasonably in investigating whether this was a disabled vehicle or stranded motorist. Id. at *5.

{¶ 26} Further, this court, in citing *Norman*, 136 Ohio App.3d 46, 735 N.E.2d 953, held in *State v. Beaureguard*, 11th Dist. No. 2006–A–0080, 2007-Ohio-3369, 2007 WL 1881319, that there is nothing in the Ohio or federal constitutions prohibiting law enforcement officers from approaching and engaging in a conversation with a motorist who they believe may be in need of assistance. Id. at ¶ 14.

{¶ 27} In the case at bar, we first observe that during the suppression hearing, appellant stipulated that Trooper Ganley had the right to stop him and investigate because his vehicle was partially in the road. In making this concession, appellant admitted that the trooper had the right to detain him for a reasonable period of time to ask a moderate number of questions related to his investigation. *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138, 82 L.Ed.2d 317. If the trooper had the right to stop appellant, as he concedes, the trooper had the right to determine where in his judgment it would be safe for him to park his cruiser. The trooper testified that he parked in the berm at the end of the driveway to ensure his own safety. As a result, appellant cannot reasonably argue that because the trooper parked his cruiser behind his vehicle, the trooper had arrested him.

{¶ 28} However, even if appellant had not stipulated to the trooper's right to stop him, we observe that in the circumstances, he would have had that right. Trooper Ganley testified that he was not sure whether the vehicle, stopped in the roadway with its headlights on, was having mechanical problems or whether its driver was experiencing some medical condition. He also testified that other motorists coming upon appellant's vehicle would not expect a car to be stopped in the roadway, and that this situation could cause an accident. He said that these issues raised a public safety concern, and it was for this reason that he decided to approach appellant.

{¶ 29} This court considered a similar argument concerning an officer's placement of his cruiser in *State v. Stack*, 11th Dist. No. 2007–A–0090, 2008-Ohio-2134, 2008 WL 1934445. In that case, the officer, while on patrol, saw the defendant drive left of center, but decided not to stop him when he pulled into a driveway. While turning around in the next driveway, the officer saw the defendant

standing outside on an uncovered dark porch in the rain. From this behavior, the officer pulled into the driveway to investigate. After approaching the defendant and learning he did not have a driver's license with him, the officer decided to run the defendant's information through dispatch to determine whether he had a valid license. Before placing him in his cruiser, the officer patted down the defendant and found cocaine. After being charged, the defendant argued that he was subject to a seizure rather than an investigative stop because the officer had pulled in behind him in the driveway. This court held that the mere fact that the officer parked directly behind the defendant did not lead to the conclusion that the defendant was unreasonably seized, especially since the officer did not prevent the defendant from exiting; the defendant's car was parked; the confrontation between the officer and the defendant took place outside of the defendant's vehicle; and the officer testified that the driveway was the only place for him to park. Id. at ¶ 23.

{¶ 30} Here, the trooper testified that he parked his vehicle at the end of the driveway to ensure his safety. We would also note that when Trooper Ganley exited his cruiser, appellant had parked his vehicle and had also left his car. The trooper did nothing to prevent appellant from leaving his vehicle. Further, the two men conversed while appellant was standing outside his car. Also, while they were talking, one of appellant's friends came over and joined the conversation. The officer asked appellant only a few questions directly related to his investigation. We hold that there was competent, credible evidence to support the trial court's finding that the trooper properly performed an investigative stop and parked his cruiser at the chosen location to ensure his safety, not to arrest appellant.

{¶ 31} For his second issue, appellant argues that because the trooper parked his cruiser where he did, appellant was in custody, so he should have received *Miranda* warnings before being questioned by Trooper Ganley. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Based on our analysis under appellant's first issue, we do not agree. The Supreme Court of Ohio has held:

{¶ 32} "Pursuant to *Miranda*, statements 'stemming from custodial interrogation of the defendant' must be suppressed unless the defendant had been informed of his Fifth and Sixth Amendment rights before being questioned. 'Custodial interrogation' means 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' *Miranda* [384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694]." *State v. Williams,* 99 Ohio St.3d 493, 505, 2003-Ohio-4396, 794 N.E.2d 27.

{¶ 33} This court has held that an individual is not "in custody" for purposes of *Miranda* when temporarily detained and questioned by a police officer during a routine traffic stop. *Djisheff,* 2006-Ohio-6201, 2006 WL 3393344, at ¶ 45, citing *Berkemer,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶ 34} In *Berkemer,* the officer observed the defendant's car weaving on the highway. The officer forced the defendant to stop. When the defendant was not able to perform a field-sobriety test without falling, the officer asked him a moderate number of questions, such as whether he had been using intoxicants, and he replied that he had consumed two beers a short time before. The United States Supreme Court held that such roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" under the rule announced in *Miranda. Berkemer,* 468 U.S. at 435–442, 104 S.Ct. 3138, 82 L.Ed.2d 317. The court noted that an ordinary traffic stop limits the freedom of action of the detained motorist and imposes certain pressures on the motorist to answer questions, thus resulting in a seizure under the Fourth Amendment. Id. at 436–438, 104 S.Ct. 3138, 82 L.Ed.2d 317. However, the court held that such pressures do not sufficiently impair the motorist's exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights. Id.

{¶ 35} In explaining the rationale for its opinion, the court noted that detention of a motorist pursuant to a traffic stop is usually temporary and brief. The vast majority of roadside detentions last only a few minutes. The court further noted that circumstances associated with a typical traffic stop are not such that the motorist feels completely at the mercy of the police. The typical traffic stop is public. Passersby on foot or in other cars can witness the interaction between officer and motorist. This circumstance reduces the ability of policemen to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that if he does not cooperate, he will be subjected to abuse. *Berkemer,* 468 U.S. at 437–438, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶ 36} The court held that the usual traffic stop is more analogous to a *Terry* stop than to a formal arrest. *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138, 82 L.Ed.2d 317. The court held: "The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*" Id. at 440, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 37} There is nothing about the case at bar that removes it from the holding in *Berkemer.* The trooper testified that he stopped appellant to investigate a public safety concern. He asked appellant a limited number of questions pertaining to his investigation. There was competent, credible evidence to support the trial court's finding that appellant was not "in custody" when he

made his comments to the trooper so that the *Miranda* warnings were not required.

{¶ 38} For his third issue, appellant argues the trooper failed to properly administer the field-sobriety tests. However, appellant challenges only the administration of the one-leg stand test. He does not challenge the admissibility of the results of the other two field sobriety tests, which appellant also failed.

{¶ 39} Appellant asserts that Trooper Ganley did not fully comply with the National Highway Traffic Safety Administration's standardized procedure when administering the one-leg stand test; hence the results of the test should be suppressed. Specifically, appellant contends that the trooper failed to (1) ask him *twice* whether he understood his instructions, as required by NHTSA standards, and instead asked him only once; (2) advise appellant to stand with his feet "together," and instead instructed him "to stand with his feet, heels and toes touching"; and (3) instruct him to keep his arms to his sides, although the record reveals that the trooper advised appellant that he was required to keep his arms down at his side during this test.

{¶ 40} Other than pointing out the foregoing alleged deviations from standard procedure in his brief, appellant cites no authority for his general proposition that the abstract deviations asserted provide a basis for a reversal. The Supreme Court of Ohio in *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, held that strict compliance is not required for admissibility at trial. Rather, in order for the results of the field-sobriety tests to be admissible, the state is required to show only that the officer performing the testing substantially complied with accepted testing standards. Id. at ¶ 21.

{¶ 41} In *Boczar*, the court stated: " '*The admission of the results of the HGN test is no different from any other field sobriety test*, such as finger-to-nose, walk-and-turn, or one-leg stand.' " (Emphasis sic.) Id., 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 26, quoting *State v. Bresson*, (1990) 51 Ohio St.3d 123, 129, 554 N.E.2d 1330. "Therefore," *Boczar* continued, "we hold that HGN test results are admissible in Ohio without expert testimony so long as the proper foundation has been shown both as to the administering officer's training and ability to administer the test and as to the actual technique used by the officer in administering the test." Id. at ¶ 27.

{¶ 42} In the case sub judice, such proper foundation is clearly reflected in the record. Trooper Ganley testified about his training and qualifications to perform each of the field-sobriety tests, including the one-leg stand, and described in detail the technique he used when administering this test to appellant. He further testified that he was trained under the NHTSA manual and that he

administered the one-leg stand test "in substantial compliance as required by NHTSA." Any compromise in reliability that may conceivably have been caused by a lack of strict compliance was available to be used by the defense to attack the evidentiary value or weight of the one-leg stand test at trial, but it does not warrant suppression of such evidence. There was competent, credible evidence to support the court's finding that the field-sobriety tests were administered in substantial compliance with NHTSA standards.

{¶43} As his fourth issue, appellant argues he was coerced into taking the breathalyzer test because, he states, Trooper Ganley told him he could not use the bathroom until he consented to take the test. However, our review of the record does not support this argument. The record reveals that during the trip to the Ravenna post, appellant said he needed to use the bathroom. The trooper told appellant he would have to wait until he decided whether or not he would take the test before being allowed to use the bathroom. We also note that during that drive, appellant asked for a drink of water. Such request was clearly inconsistent with appellant's statement that he needed to urinate, and the trial court was entitled to consider it in assessing appellant's credibility.

{¶44} In any event, contrary to appellant's argument, the trooper did not make use of the facilities contingent on appellant's taking the breathalyzer test. Instead, the trooper told appellant that once he decided to *either take or refuse to take the test,* he could use the bathroom. The option of whether to take or not to take the breathalyzer test was never taken away from appellant. The choice was his, but he had to make it before he could use the bathroom. Finally, we note that appellant has not cited any authority that in the circumstances presented here, appellant's submission to the breathalyzer test was the result of coercion. There was competent, credible evidence to support the trial court's finding that appellant's submission to the test was not coerced.

{¶45} Finally, for his fifth issue, appellant argues that because Trooper Ganley was not able to testify from his personal knowledge that the calibration solution was refrigerated, no evidence was produced to prove compliance with the refrigeration requirement set forth at Ohio Adm.Code 3701–53–04, and the results of the breathalyzer test should have been suppressed. Trooper Ganley testified that the solution used to calibrate the breathalyzer machine is stored in a special refrigerator at the post, which is operating and is always on. However, he did not actually see the solution being placed in the refrigerator.

{¶46} This court addressed nearly the identical argument in *State v. McCardel* (Sept. 28, 2001), 11th Dist. No. 2008–P–0092, 2001 WL 1149182, as follows:

{¶47} "[Moreover], appellant claims that the state failed to comply with Ohio Adm.Code 3701–53–04(4)[sic], which governs the refrigeration of calibration

solution. Appellant specifically maintains that Trooper Russell did not have actual knowledge of whether the calibration solution used was refrigerated and did not know at what temperature the solution was refrigerated.

{¶ 48} "After a defendant raises the issue of a test's reliability, the state is only required to prove substantial compliance with the [Ohio Department of Health ("ODH")] regulations. Once the state demonstrates substantial compliance, the burden then shifts to the defendant to show he or she was prejudiced by the state's failure to strictly comply with the regulations. * * *

{¶ 49} "Ohio Adm.Code 3701–53–04(C) requires that the 'calibration solutions shall be kept under refrigeration after first use, when not being used. * * *' Accordingly, the burden was on the state to show substantial compliance with this requirement.

{¶ 50} "While we agree with appellant that there was nothing in the record to indicate the exact temperature at which the calibration solution was stored, this is of no consequence. Ohio Adm.Code 3701–53–04 does not set forth a particular temperature range to store the solution. Rather, the regulation merely provides that the solution be kept refrigerated after first use. * * *

{¶ 51} "Moreover, there is nothing in the record to support appellant's allegation that the solution was not refrigerated. Contrary to appellant's assertion, Trooper Russell testified that the solution used to calibrate the Breathalyzer machine was, indeed, refrigerated. Nor was there any evidence of a mechanical problem with the refrigerator.

{¶ 52} "Hence, we determine that the state carried its burden to show substantial compliance with the requirement that the solution used to calibrate the equipment used to administer appellant's breath test be kept refrigerated when not in use." Id. at *5–6.

{¶ 53} Trooper Ganley's testimony that the calibration solution was refrigerated satisfied the state's burden to prove substantial compliance with the refrigeration requirement. Once such evidence was introduced, appellant had the burden to present evidence that the state did not strictly comply with the regulation and that he was prejudiced by the state's failure to comply. There is no evidence that the calibration solution was not refrigerated at all pertinent times or that the refrigerator was not properly functioning.

{¶ 54} The thrust of appellant's cross-examination was to challenge the reliability of the trooper's testimony because he did not personally observe the solution being placed in the refrigerator. However, appellant did not present any evidence that the state violated the regulation or that he was prejudiced by any violation. There was competent, credible evidence to support the trial court's

finding that the state substantially complied with the ODH regulation regarding refrigeration of the solution.

{¶ 55} For the reasons stated in the opinion of this court, the assignment of error is not well taken. It is the judgment and order of this court that the judgment of the Portage County Municipal Court, Ravenna Division, is affirmed.

Judgment affirmed.

CANNON, J., concurs.

O'TOOLE, J., dissents.

COLLEEN MARY O'TOOLE, Judge, dissenting.

{¶ 56} Believing the motion to suppress should have been granted, I would reverse and remand.

{¶ 57} "If a suspect is in custody, police officers are required to advise the suspect of his *Miranda* rights prior to questioning him. *Miranda v. Arizona* (1966), 384 U.S. 436, 478–479 [86 S.Ct. 1602, 16 L.Ed.2d 694] * * *. To determine whether one is in custody, courts must focus on how a reasonable person in the detainee's position would have felt if he was in the same position. *State v. Gaston* (1996), 110 Ohio App.3d 835, 842, 675 N.E.2d 526, * * *." *State v. Curtis*, 11th Dist. No. 2002–A–0025, 2003-Ohio-6085, 2003 WL 22697974, at ¶ 17.

{¶ 58} Certainly, police officers may approach motorists who seem to be in need of assistance. But in this case, the vehicle had left the road and parked in a driveway. There was no further need to render assistance. Yet the arresting officer blockaded the vehicle and its occupants in that driveway with his cruiser with the lights on. Any reasonable person would believe, under these circumstances, that he was in custody. Appellant should have been advised of his rights immediately.

{¶ 59} Warrantless searches and seizures are presumptively unconstitutional and illegal under the Fourth Amendment to the United States Constitution. I recognize that the state's power to intrude upon the citizenry is greater in the heavily regulated context of driving upon the public highways. However, there was no mistake by appellant that he was not free to leave the premises, nor could he do so without exiting his car. This is clearly a seizure. In Ohio, a citizen now abandons his or her Fourth Amendment rights merely by sitting in an automobile. I respectfully dissent.