The STATE of Ohio, Appellee,

v.

GASTON, Appellant.

[Cite as *State v. Gaston* (1996), 110 Ohio App.3d 835.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 95–L–126.

Decided May 6, 1996.

*Charles E. Coulson,* Lake County Prosecuting Attorney, *Ariana E. Tarighati* and *Taylir K. Linden,* Assistant Prosecuting Attorneys, for appellee.

*R. Paul LaPlante,* Lake County Public Defender, and *Susan Grieshammer,* Assistant Public Defender, for appellant.

Ford, Presiding Judge.

This is an appeal from a Lake County Court of Common Pleas decision which denied appellant Derry Gaston's motion to suppress.

On October 13, 1994, Lt. Daryl Dunlap of the Painesville Police Department reported to work at 6:25 a.m. for the morning shift. While conversing with another officer in a meeting/conference room located within the station, Lt. Dunlap received a telephone call from a confidential informant. The informant, who had worked with Lt. Dunlap in a prior case which had led to a successful felony arrest, told him that two black males were in the area around the intersection of 207 West Jefferson Street and 119 Matthews Street. The informant stated that the two males had just received a quantity of "crack" cocaine, and were now leaving the area on foot. One of the males was identified as Earlie "Butchie" Watson, who was described as wearing a black "White Sox" baseball cap, dark leather jacket and dark pants. The other person was unknown to the informant, but was described as being taller than Watson and wearing a

yellow sweatshirt. Watson was seen by the informant possessing a revolver, which he stated was still concealed on his person.

Lt. Dunlap notified officers who were on patrol in the area to check on the tip, and Patrolman Jerry Sharp and Patrolman Gerald Lynch responded. When they arrived at the area in question, they immediately spotted Watson, whom they knew from prior encounters and who was wearing the clothing that was described by the informant. They also saw appellant, who was accompanying Watson, and who was wearing a jacket and a University of Miami "Hurricanes" sweatshirt, which included a yellow "beak" on the university mascot. Appellant was also significantly taller than Watson.

The two officers approached the men,[1] whom they stopped and each was subjected to a "frisk" for the weapon which was described by the informant and asked general investigatory questions regarding the drug allegations. Patrolman Sharp asked appellant, who had his hands placed on a police cruiser for the frisk, whether he had any weapons or drugs. Patrolman Lynch directed his attention to frisking Butchie and asking similar questions. Appellant responded to Patrolman Sharp that he had "weed" in one of his pockets. Once this was recovered and the frisk had resumed, appellant further informed Patrolman Sharp that he had "rock" in another pocket. No weapon was ever located on or near either of the men who had been stopped. Appellant was placed under arrest at this time.

On December 19, 1994, appellant was indicted for one count of trafficking in drugs, in violation of R.C. 2925.03. On February 10, 1995, appellant filed a motion to suppress all evidence, alleging that the police had made an unlawful stop and seizure, and also that they had not properly advised appellant of his rights before subjecting him to custodial interrogation. This motion to suppress was overruled on May 26, 1995. On June 2, 1995, appellant pleaded no contest to one count of aggravated trafficking in drugs, a lesser included offense of the charged crime, in violation of R.C. 2925.03, and was sentenced accordingly. Appellant now appeals raising the following as error:

"1. The trial court erred in denying the defendant-appellant's motion to suppress evidence obtained by the Painesville Police Department as the result of an unconstitutional seizure of his person.

"2. The trial court erred in denying the defendant-appellant's motion to suppress evidence obtained by the Painesville Police Department as a result of an unconstitutional search of his person.

"3. The trial court erred in denying the defendant-appellant's motion to suppress statements obtained by the Painesville Police Department without

---

1. It is unclear whether Patrolman Lynch had his weapon drawn from the record in this case.

compliance with the procedural protection afforded an individual subject to custodial interrogation, in accord [*sic* ] with the decision reached in *Miranda v. Arizona* [ (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694]."

In appellant's first assignment, he contends that because he was subjected to an illegal seizure of his person, everything which followed that seizure should have been excluded. In particular, appellant takes issue with the sufficiency of the facts in possession of the police officers which would support their decision to stop and briefly detain him. Appellant claims that the informant was not proven to be sufficiently reliable, and the clothing worn by appellant was not a "yellow sweatshirt," rather, it was "green" with a "yellow beak." Appellant believes that the police had no specific articulable facts which permitted them to stop and detain him because of these deficiencies.

In *Terry v. Ohio* (1968), 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, 907, the United States Supreme Court recognized that police officers may conduct reasonable searches of individuals who are not in custody to ensure that they are not armed prior to conducting investigatory questioning. This investigative-stop exception to the Fourth Amendment warrant requirement allows the police to detain an individual if the officer has a reasonable suspicion, which is based upon specific and articulable facts, that criminal behavior has or is about to occur. The propriety of an investigative stop must be viewed by reviewing the totality of the circumstances. *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271; *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489; *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044.

In this case, Lt. Dunlap received a telephone call from a confidential informant that he had relied upon in a previous criminal investigation, and was told that two men meeting the description of Watson and appellant were armed and carrying drugs at a specified location. These facts were relayed to the officers who were patrolling the area. The Supreme Court of the United States in *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, adopted a "totality of the circumstances" approach when determining whether an informant's tip is sufficient to support an arrest or an investigative stop. In this case, Lt. Dunlap appeared to be convinced that his informant was reliable, a position which apparently was adopted by the trial court.

However, even in cases involving anonymous informants, a tip is sufficient where certain important or key elements of the tip are corroborated by police observation or investigation. See *Alabama v. White* (1990), 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301. If the trial court determined that the informant in this case may have not been completely reliable or that his reliability was somehow in question, the trial court still may have concluded that the police had

sufficient independent corroboration confirming the tip to support the investigative stop. Watson, who was specifically identified by name and description, and appellant, who closely resembled the description which was provided by the informant, were seen walking together at the precise location the informant said that they would be. The description of appellant was not as precise as the description of Watson, but it was specific enough under the totality concept so as to provide an appropriate basis for a *Terry* stop of appellant also.

The area where appellant was ultimately arrested was also identified by the police in this case as having a strong criminal presence.[2] The police, based on the totality of the circumstances, had a reasonable and articulable suspicion to support the stop because the tip provided by the informant had been largely verified by on-scene observation. See *State v. Halahan* (1995), 108 Ohio App.3d 33, 669 N.E.2d 883.

Appellant next contends that because he was not wearing a completely yellow sweatshirt, that the police had no grounds to detain him. Appellant seems to suggest that the police could have reasonably stopped appellant only if he was wearing a completely yellow sweatshirt. This contention is without merit. The officers observed two black males who closely matched the description provided by the informant, in the exact location where they were reported to have been engaged in illegal drug activity. Patrolman Sharp testified:

"[Appellant] was wearing a Miami Hurricanes shirt which was green in color, but also [had] a very bright big pelican with a yellow beak on it and feet and others, [which was] conspiculously [*sic*] yellow on the dark [which] stood out."

Accordingly, the largely corroborated tip from the informant, including appellant's attire, provided the officers with sufficient suspicion to stop and detain appellant and Watson to determine whether they had been engaging in illegal activities. Appellant's first assignment is overruled.

■ Appellant's second assignment takes issue with the constitutionality of the search of appellant's person in this encounter. Appellant correctly states that a *Terry* search is a search for weapons designed to ensure the safety of the police officers from the obvious danger presented when the person being questioned possesses a concealed weapon. Appellant contends that because the search in this case uncovered illegal narcotics, not a weapon, that it was beyond the scope of a *Terry* search, and was illegal.

---

2. The reputation of an area as having strong criminal activity has been interpreted by the Supreme Court of Ohio as "an articulable fact which is part of the totality of circumstances surrounding the stop to investigate suspicious activity." *Andrews*, 57 Ohio St.3d at 88, 565 N.E.2d at 1274; *Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489.

A review of the transcript of the suppression hearing shows that appellant was searched to ensure that no weapons were present. Patrolman Sharp testified:

"[A.] I said, now, you [appellant] don't have any drugs, or guns, or needles on you that I [am] going to stick myself with and hurt myself with, I always do that—

"[Q.] [W]hat was the initial purpose of that pat down or touching this Defendant?

"[A.] To look for a weapon.

"[Q.] And the purpose of your question was what?

"[A.] [T]o ask if there was [sic] any weapons or things I am going to get hurt with, needles.

"[Q.] So, that's for your safety?

"[A.] Yeah.

" * * *

"[Q.] And upon asking the question did [appellant] make a response to you?

"[A.] Yes. * * * He said all I got is some weed. * * * [Appellant] said the weed was in the pocket of his coat, * * * I pulled that out, two small bags, one smaller than the other of suspected marijuana.

"[Q.] What, if anything, occurred after you discovered this marijuana?

"[A.] I said, 'Now, do you have anything else on you?' He said 'Yeah, I got some rock over here.' * * * [Appellant] pointed inside his coat, he started to reach for it. I told him 'I will get it, you don't reach inside of your coat.'

"[Q.] What was the purpose of not letting him reach inside his coat?

"[A.] In case there was a weapon in there, handgun."

■ The foregoing shows that appellant, during the course of a permissible *Terry* search, volunteered information regarding items which could be found inside his pockets. While no weapon was ultimately located, appellant's statements clearly show that the officers were provided with a new basis for the search, specifically that there were drugs located in his pockets. Given the threat posed by weapons and "used" drug needles, the questions asked were appropriate. The finding of these drugs were incident to a lawful search. Although this court does not wish to sanction the type of questioning used by the officer regarding whether appellant had drugs *prior* to asking about weapons in the *Terry* setting, we simply cannot say that such questioning was *per se* unreasonable.

As the court stated in *State v. Van Fossen* (1984), 19 Ohio App.3d 281, 284, 19 OBR 452, 455–456, 484 N.E.2d 191, 194, *"Miranda* warnings were not required at that time, for such inquiry was merely on-scene investigative questioning, and not custodial interrogation." Appellant's second assignment is overruled.

Appellant's third assignment concerns alleged error in the trial court's decision not to grant appellant's motion to suppress because he believes that the statements made by him were given while in custody, and before being advised of his rights. *Miranda.*

In this case, it is clear that the questions asked by Patrolman Sharp would require that the *Miranda* warnings be provided if appellant were in custody at the time of the questioning. In *Miranda*, the court stated:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from a *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Emphasis added and footnote omitted.) *Id.,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

■ The determination of whether one is in custody focuses on how a reasonable person in the detainee's position would have felt in the same position. *Berkemer v. McCarty* (1984), 468 U.S. 420, 434, 104 S.Ct. 3138, 3147, 82 L.Ed.2d 317, 331. *Miranda* warnings are required only when a person is actually deprived of his or her freedom in some significant way. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 255–256, 15 OBR 379, 392–394, 473 N.E.2d 768, 784–785.

■ A police officer is free to use such reasonable force as is necessary to ensure his safety when making an investigative stop. It has been held that even the use of a drawn weapon is permissible if the circumstances in that case warranted that response. *United States v. Jackson* (C.A. 2, 1981), 652 F.2d 244; *United States v. Bull* (C.A. 4, 1977), 565 F.2d 869. See, also, *Wells v. Akron* (1987), 42 Ohio App.3d 148, 537 N.E.2d 229. Similarly, ordering a person to place his hands on a car roof and to "freeze" is reasonable where the officer has a reasonable suspicion that the defendant is armed at the time of the stop. See, *e.g., State v. Young* (May 7, 1987), Cuyahoga App. No. 51984, unreported, 1987 WL 11187. As stated by the court in *State v. Harrington* (June 1, 1994), Montgomery App. No. 14146, unreported, 1994 WL 285048:

"The point in time when an investigatory stop ripens into an arrest depends on the particular facts in each case. The use of force, such as a drawn gun by police

officers, does not automatically convert an investigatory stop into an arrest. *United States v. Lane* (6th Cir., 1990), 909 F.2d 895; [*Wells* ]."

■ The questioning regarding possession of drugs was simply on-scene investigative questioning, which in no way triggered the requirement of *Miranda* warnings. See *Berkemer,* 468 U.S. at 434, 104 S.Ct. at 3147, 82 L.Ed.2d at 331; *Van Fossen,* 19 Ohio App.3d at 284, 19 OBR at 455–456, 484 N.E.2d at 194–195. Such questioning would be akin to questions regarding the consumption of alcoholic beverages during a traffic stop. At no point was appellant required to answer questions posed by the police, and he was not under arrest until after he had volunteered the information concerning the contents of his pockets. Appellant was simply asked routine questions in a brief investigatory stop that did not rise to the crest of custodial interrogation. Appellant, although detained for a time, was not "in custody," and therefore, Patrolman Sharp was not required to advise appellant of his *Miranda* rights. The police action of requiring him to place his hands on the patrol car was reasonable given the officers' belief that appellant or Watson was armed, pursuant to the informant's tip. Appellant's third assignment is overruled.

For the foregoing reasons, appellant's assignments of error are without merit. The decision of the Lake County Court of Common Pleas is affirmed.

*Judgment affirmed.*

JOSEPH E. MAHONEY, J., concurs.

CHRISTLEY, J., dissents.

CHRISTLEY, Judge, dissenting.

I respectfully dissent as to the majority's determination in the second assignment that the search did not exceed the scope of a *Terry* search, *Terry v. Ohio* (1968), 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, 907, and its determination in the third assignment that Miranda warnings were not needed.

The testimony of one of the two police officers who actually conducted the investigative stop was that prior to the pat-down frisk, the defendant was spread-eagle against the car and that "I believe we; Ptlm. Lynch, might have pulled his weapon * * *." Officer Lynch did not testify. Appellant was not questioned on this point.

The majority places reliance on *Wells v. Akron* (1987), 42 Ohio App.3d 148, 537 N.E.2d 229, for the proposition that the use of a drawn weapon is permissible if the circumstances of an investigative stop warrant it, *i.e.,* the suspect is believed to be armed. I do not disagree with that statement if it is viewed in context. Such a view, however, reveals two overlooked points: first, *Wells* is a civil rights

case, not a criminal matter, and the issue was whether the use of force was justified; second, there were no issues of any resultant incriminating statements or evidence.

*Wells* relies upon *United States v. Jackson* (C.A. 2, 1981), 652 F.2d 244, and rightfully so, for its position that the use of a drawn weapon in an investigative stop is justifiable force when the police have reason to believe they may be dealing with an armed suspect.

However, *Jackson* also did not involve the suppression of a statement made while the officer's gun was drawn. The officer in *Jackson* specifically indicated that "[h]e returned the gun to its holster as soon as his partner's frisk of Jackson ensured that he was not armed."

Here we are to believe that a defendant would not consider himself in custody when he is spread-eagle over a car while being frisked by one officer, while another officer stands by with a drawn weapon. I can think of no rational and reasonable person who would feel free to either leave or not answer questions under those circumstances.

Although the drawn weapon and pat-down frisk would be appropriate to an investigative stop where there is a reasonable belief that a weapon is involved, an interrogation conducted at the same time which was designed to elicit incriminating statements would not be appropriate under those circumstances without *Miranda* warnings.

The caveat would seem to be that while a drawn gun and frisk do not necessarily turn an investigative stop into an arrest, any simultaneous interrogation which solicits incriminatory information had best follow the holstering of the weapon and a clear return to the more neutral playing field of an investigative stop or be preceded by the administration of *Miranda* warnings. Even if no gun had been drawn, I would still find that these circumstances would have required *Miranda* warnings before the provocative interrogation was begun.

As to the third assignment, the specific question asked by Officer Sharp was "I said, now, you don't have any *drugs,* or guns, or needles on you that I [am] going to stick myself with and hurt myself with, I always do that * * *." (Emphasis added.)

I can accept the majority's determination of acceptability for everything except the use of the word "drugs." How could the presence of "drugs" pose a threat of harm to the officer? It was a question which begged for an incriminating response, one not necessary or associated with the purpose of the frisk, *i.e.,* the safety of the officer. I believe wholeheartedly in procedures which help ensure the safety of the police officers. Even when some conflicting rights of defendants

must be sacrificed, such procedures are justified. However, those procedures cannot be utilized unnecessarily to flout basic rights of citizens.

Accordingly, I dissent.