[Cite as *State v. Anderson*, 2023-Ohio-945.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MONROE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BRIAN L. ANDERSON,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MO 0001**

---

Criminal Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case Nos. 2021-243, 2021-270

**BEFORE:**
Carol Ann Robb, David A. D'Apolito, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. James L. Peters*, Monroe County Prosecutor, Monroe County Prosecutor's Office, 101 N. Main Street, Room 15, Woodsfield, Ohio 43793 for Plaintiff-Appellee and

*Atty. Michael A. Partlow*, P.O. Box 1562, Stow, Ohio 44224 for Defendant-Appellant.

Dated: March 23, 2023

**Robb, J.**

_____

**{¶1}** Defendant-Appellant Brian L. Anderson appeals after being convicted by a jury of multiple offenses in the Monroe County Common Pleas Court. He contends the trial court should have suppressed the following: his statement before he was _Mirandized_; the methamphetamine recovered from his pocket after he acknowledged he had drugs; and his statements after he was _Mirandized_. He also challenges the sufficiency of the evidence and the weight of the evidence as to the operability of the gun recovered, contesting whether the gun met the definition of a firearm. For the following reasons, Appellant's convictions are affirmed.

STATEMENT OF THE CASE

**{¶2}** On July 15, 2021, Appellant was indicted for unlawful possession of a dangerous ordnance, a fifth-degree felony in violation of R.C. 2923.17(A), and having a weapon while under disability, a third-degree felony in violation of R.C. 2923.13(A)(3). On August 19, 2021, he was indicted for aggravated possession of drugs in violation of R.C. 2925.11, a second-degree felony due to the amount of methamphetamine (meth), 25.89 grams (more than five times the bulk amount of 3 grams). This charge replaced a drug charge in the first indictment when the two indictments were consolidated upon the state's motion. (8/25/21 J.E.); (Tr. 3).

**{¶3}** Appellant filed a motion to suppress his statements and the meth. As to his pre-_Miranda_ statement admitting the baggie in his pocket contained "dope," he claimed the deputy sheriff conducting a weapons pat-down was required to _Mirandize_ him before asking if the object felt in his pants was "dope" because Appellant reasonably considered himself in custody after being ordered out of the vehicle and handcuffed. If _Miranda_ was inapplicable to that statement, the suppression motion alternatively argued the drugs should be suppressed because the removal of the baggie from Appellant's pocket was beyond the permissible scope of a weapons pat-down and the deputy thus needed a search warrant to remove it from his pocket, claiming Appellant was not placed under arrest before the removal. Lastly, as to post-_Miranda_ statements, Appellant's motion to

suppress claimed he did not understand the *Miranda* rights recited by the deputy during the pat-down.

{¶4} At the November 15, 2021 suppression hearing, the state played the body-cam video for the court and presented the deputy's testimony. (St.Ex. 3). The deputy testified he was on patrol at 9:30 a.m. on June 10, 2021 when he conducted a roadside welfare check on the two occupants of a car pulled to the side of State Route 7. (Supp.Tr. 6-7). The driver's window was rolled down. (Supp.Tr. 10). The female in the driver's seat had "a Methamphetamine smoking device protruding" from her low-cut top (seemingly tucked into her bra); it was further described as a glass pipe with a ball at the end. (Supp.Tr. 8-9). Appellant was in the passenger seat.

{¶5} The deputy said they both appeared to be in a heavy sleep or passed out as if under the influence of a substance. (Supp.Tr. 7-9). To rouse the occupants, the deputy said "hey," knocked on the car door, and said "hey" again. The deputy believed the occupants seemed confused about their location; he observed the female's eyes were red. (Supp. Tr. 10, 12). The deputy ordered her out of the vehicle, placed her in handcuffs, and confiscated the glass pipe. (Supp.Tr. 10-11).

{¶6} Before leading the female to sit on the front bumper of his police cruiser, the deputy instructed Appellant to place his hands on the dashboard. According to the deputy, Appellant kept removing his hands from the dashboard and moving abruptly. (Supp.Tr. 11). Upon returning to remove Appellant from the vehicle, the deputy asked Appellant to unlock the passenger door.

{¶7} When the door opened, the deputy viewed a sawed-off shotgun between the passenger seat and the passenger door. He could see it violated the law as a dangerous ordnance (a shotgun with less than 18 inches of barrel or less than 26 inches in overall length). (Supp.Tr. 12-13). The shotgun was within easy access of Appellant. (Supp.Tr. 13-14). While Appellant stepped from the car, the deputy asked if the gun was loaded. From the deputy's next statement on the body cam, it seems Appellant said it was not loaded (and the deputy testified at trial that Appellant said it was not loaded).

{¶8} To prevent access to the gun and fearing an additional weapon, the deputy handcuffed and frisked Appellant. (Supp.Tr. 15-16). The deputy testified about patting down Appellant's front pocket as follows: "through my training and experience, I felt what appeared to be a foreign substance, like a narcotic, a pretty large bag. * * * I knew it was

a narcotic." He said to Appellant, "is this dope? It feels like dope." Appellant replied, "yes, it is dope." (Supp.Tr. 15-16). The deputy explained the amount of drugs in the baggie felt substantial and the pocket bulge was visible. (Supp.Tr. 18). The deputy opined Appellant was not formally under arrest during the pat-down but explained he would have eventually taken Appellant to jail and charged him with possession of a dangerous ordnance as a result of the sawed-off shotgun (even if drugs had not been discovered in Appellant's pocket). (Supp.Tr. 19, 25-26).

{¶9} After Appellant acknowledged the bulge was dope, the deputy provided *Miranda* warnings. When the deputy asked if he understood the rights, Appellant "just kept like becoming frustrated with the situation" or "getting agitated." (Supp.Tr. 22, 27). The deputy testified he had no reason to believe Appellant lacked the capacity to understand him, stating Appellant did not seem so intoxicated that he could not understand *Miranda* rights. (Supp.Tr. 22-23). The deputy again asked if Appellant understood his rights while explaining he wanted to ask if the bag contained fentanyl due to concerns about exposure; Appellant then said it was not fentanyl. (Supp.Tr. 16).

{¶10} The deputy then removed the baggie from Appellant's pockets. Other deputies arrived, and a search of the car revealed additional contraband, which was claimed by the driver and resulted in charges against her. (Supp.Tr. 19). Appellant later admitted he smoked meth at some earlier point and said a man provided it in exchange for a ride. (Supp.Tr. 22-23, 26, 29). When filing his report later, the deputy discovered Appellant was under a firearm disability.

{¶11} After hearing this testimony, the trial court denied the motion to suppress. In the December 28, 2021 judgment entry, the court concluded the question asking whether the bulge was dope was mere on-scene investigative questioning, which did not trigger *Miranda*, citing *State v. Gaston*, 110 Ohio App.3d 835, 675 N.E.2d 526 (11th Dist. 1996). Based on Appellant's answer identifying the bulge as dope, the court found the officer was permitted to retrieve the illegal item from the pocket. The court also found the deputy was permitted to remove the baggie under the plain feel doctrine, finding it was immediately apparent to the deputy that the bulge in Appellant's pants was drugs. It was noted the deputy's mid-pat-down question on whether the bulge was dope was immediately followed by his observation that it felt like dope. As to post-*Miranda* statements, the court concluded Appellant understood the rights recited to him.

{¶12} At the jury trial, the arresting deputy's body camera video was played for the jury. (Tr. 147); (St. Ex. 3, to 13-minute mark). A BCI forensic scientist testified the substance submitted by the state was meth and weighed 25.89 grams. (Tr. 113, 115). She explained meth was a schedule II controlled substance with a bulk amount of 3 grams. (Tr. 115-116). The deputy's trial testimony repeated much of the testimony he gave at the suppression hearing (summarized supra). He additionally noted the drugs weighed 28.31 grams while in the baggie, as confirmed by a photograph of the baggie on a scale. (Tr. 132); (St.Ex. 2). A photograph of items recovered from the vehicle was also admitted. (St.Ex. 4). The deputy noted while the driver claimed ownership of various items, including meth pipes, she did not claim ownership of the shotgun.

{¶13} The deputy pointed out Appellant said the gun was not loaded but also said it belonged to a person who was previously in the car. (Tr. 129, 134). The deputy testified the shotgun's barrel measured only 12 inches, and a photograph of it next to a tape measure was admitted. (Tr. 135); (St.Ex. 5). The shotgun had a trigger, a hammer, and an intact firing pin. It was considered a safety hazard to test fire the shotgun with a live round due to the short barrel (and what he believed was a pistol grip modification). However, a "dry fire" was conducted where the hammer was pulled back, the trigger was pulled, and the firing pin was observed to be operating as expected. (Tr. 135-137). The parties stipulated Appellant was under indictment for felony possession of drugs in Summit County at the time in question (an element of having a weapon while under disability). (Tr. 4, 104, 176).

{¶14} The jury found Appellant guilty of all three offenses. The court sentenced Appellant to 4 to 6 years for aggravated drug possession (for which prison was mandatory), 30 months for having a weapon while under disability, and 11 months for unlawful possession of a dangerous ordnance, all to run concurrently. (1/31/22 J.E.). See R.C. 2925.11(C)(1)(c) and R.C. 2929.13(F)(5) (mandatory prison for the drug offense regardless of community control factors). The within timely appeal followed.

ASSIGNMENT OF ERROR ONE: SUPPRESSION

{¶15} Appellant sets forth two assignments of error, the first of which contends:

"THE TRIAL COURT ERRED IN VIOLATION OF APPELLANT'S RIGHTS PURSUANT TO THE 4TH, 5TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE."

{¶16} First, Appellant argues his pre-*Miranda* statement agreeing the pocket bulge was drugs should have been suppressed. Before the deputy asked about the bulge, the deputy saw an illegal shotgun as Appellant alighted from the vehicle and asked if it was loaded; Appellant said it was not loaded. (Tr. 129); (St.Ex. 3). After observing the illegal shotgun and during the handcuffed frisk, the deputy felt the front pocket of Appellant's pants and asked, "is this dope? It feels like dope." Appellant immediately replied, "yes, it is dope." The deputy then *Mirandized* Appellant and told him he did so in order to further inquire about the specifics of the drugs because he feared fentanyl exposure.

{¶17} The state argues the deputy's question (on whether the bulge was dope) was not the product of a custodial interrogation but was mere onsite investigation, such as when an officer asks if a driver has been drinking, citing *Gaston*, 110 Ohio App.3d 835.[1] As pointed out by the United States Supreme Court in *Miranda*: "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶18} Pursuant to *Miranda*, before a custodial interrogation, the police officer must warn the suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444. In the absence of *Miranda* warnings, a statement made during a custodial interrogation is subject to exclusion from a criminal prosecution. *Id.* at 479.

{¶19} A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 445. The fundamental question is whether there was a formal arrest or a restraint on the detainee's freedom of movement to the degree associated with a formal arrest, under the totality of the circumstances. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). "But 'not free to

---

[1] During a frisk for weapons while a detainee had his hands spread on the police cruiser, the officer asked about drugs, guns, needles, or any objects that could hurt the officer. The Eleventh District concluded this was mere onsite questioning not subject to *Miranda*. However, the court focused on the portion of the question relating to harm to the officer and specified it did not wish to validate the initial portion of the question about drug possession. *Gaston*, 110 Ohio App.3d at 841.

leave' and 'in custody' are distinct concepts." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 30. "[T]he test is not whether the individual feels free to leave but whether the situation 'exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights'." *Id.* at ¶ 31, quoting *Berkemer v. McCarty*, 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

**{¶20}** Although the roadside detention of a vehicle significantly restricts the freedom of the driver and the passengers and is a seizure, the person "temporarily detained as part of a routine traffic or investigatory stop is not generally deemed 'in custody,' and, hence, is not entitled to *Miranda* warnings." *Berkemer*, 468 U.S. at 436. A traffic stop is temporary, brief, public, and substantially less police-dominated than the type of interrogation at issue in the *Miranda* case, especially where only one officer is present. *Id.* at 421, 437-440 (even though it imposes some pressure to answer questions). The court considers how a reasonable person in the detainee's position would have viewed his situation under the totality of the circumstances. *Id.* at 442. An officer's unarticulated plan has no bearing on the question of whether a suspect was in custody at a particular time. *Id.* (the officer could ask the driver if he had been using intoxicants after the officer decided to arrest without voicing his intent to arrest).

**{¶21}** Initially, we point out the question as to whether the gun was loaded was not asked during a custodial interrogation. Appellant does not dispute the deputy was permitted to order him out of the vehicle after the removal of the female driver. During a valid investigatory stop, officers may order occupants, including the passengers, out of the vehicle to complete the stop without violating the Fourth Amendment. *Maryland v. Wilson*, 519 U.S. 408, 413-415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). The sawed-off shotgun was in plain view as the passenger door was opened. The deputy's question about the gun was asked while Appellant was alighting from the vehicle. The question was posed in response to an emergency situation of an occupant being removed from a vehicle while within inches of a sawed-off shotgun, which is a dangerous ordnance. *New York v. Quarles*, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (the public safety exception allows a police officer to temporarily refrain from reciting *Miranda* in order to ask questions necessary to securing the immediate safety of himself or the public).

**{¶22}** In fact, Appellant acknowledges a frisk for weapons was warranted. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (an investigative seizure made with mere reasonable suspicion of criminal activity permits a frisk for weapons without violating the Fourth Amendment). We also note Appellant's brief does not specify an argument about the pre-*Miranda* statement on the gun being unloaded in making his suppression argument. Rather, his specific pre-*Miranda* suppression argument focuses on his pre-*Miranda* statement identifying the bulge in his pocket as dope, which occurred after he was handcuffed. (Apt.Br. 5).

**{¶23}** As to the single mid-frisk question asking whether the bulge was dope, there had not yet been a formal arrest. Therefore, to determine if Appellant was in custody, the question is whether the totality of circumstances demonstrate a restraint on the detainee's freedom of movement to the degree associated with a formal arrest. *Beheler,* 463 U.S. at 1125. Some circumstances before the frisk arguably supporting a custody argument include: the deputy instructed Appellant to place his hands on the dashboard multiple times; Appellant knew the deputy saw the firearm; and Appellant was placed in handcuffs upon his removal from the vehicle. Still, "handcuffing a detainee where there is reasonable suspicion to frisk for weapons does not automatically convert a stop into an arrest. * * * In some cases, the act of handcuffing may constitute a reasonable means to detain an individual during an investigatory stop." *State v. Whitfield*, 7th Dist. Mahoning No. 99CA111 (Nov. 1, 2000).

**{¶24}** Relevant circumstances tending toward a *pre*-custodial question in this case include: the daytime public roadside setting where the driver was removed from the car (due to sleeping in the driver's seat with a meth pipe protruding from her bra); the presence of only one officer with two detainees; the officer did not draw his weapon; the question was asked within a minute of Appellant's removal from the car; the question was asked only one time (and was immediately followed by the deputy's expression of his own belief that it felt like dope) to which Appellant immediately answered it was dope; the situation unfolded fast with the officer wishing to secure Appellant's position and unarmed status before securing the sawed-off shotgun; and there were no coercive comments. *See Oles*, 152 Ohio St.3d 1 at ¶ 24 (listing three categories of factors: minimal intrusion, brief questioning and detention, and non-threatening or non-intimidating interaction).

Under the totality of the circumstances, Appellant would not yet have considered himself to be in custody to the degree associated with a formal arrest.

**{¶25}** Regardless, even if we were to rule in Appellant's favor on this particular issue (and the question on whether the bulge was dope is considered a custodial interrogation), this would not necessarily be dispositive of the appeal in his favor.

**{¶26}** If Appellant's admission was properly obtained, then the admission provided probable cause to believe the baggie contained a large amount of a controlled substance and no warrant would have been required to recover the drugs. *See State v. Moore*, 90 Ohio St.3d 47, 734 N.E.2d 804 (2000) (an officer with probable cause to believe a person has drugs during a traffic stop need not leave the drugs in the person's pocket while a warrant is obtained under the exigency exception). Appellant does not argue otherwise below or on appeal.

**{¶27}** If Appellant's admission ("yes, it is dope") should have been suppressed, the disclosure of this statement to the jury was not prejudicial to his conviction if the drugs were admissible anyway. *See, e.g., State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983) (improper admission of the confession which should have been suppressed due to violation of right to counsel, was harmless beyond a reasonable doubt as the remaining evidence was overwhelming). The baggie was recovered from Appellant's front pants pocket. It contained a large amount of a substance. Scientific testing showed the substance was meth and weighed over 25 grams. With this evidence, Appellant's confirmation that the baggie was dope did not influence his conviction of aggravated possession of drugs or the weapons offenses.

**{¶28}** This leads to Appellant's argument that if his admission of dope was subject to exclusion, then the drugs should have been suppressed because a warrant was required to remove the baggie from his pocket. In addition to finding Appellant's initial statement was part of an onsite investigation before *Miranda* was triggered, the trial court also applied the plain feel doctrine and found it immediately apparent to the deputy that the bulge in Appellant's pants was drugs.

**{¶29}** A *Terry* frisk "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby * * *." *Terry*, 392 U.S. at 26. However, as the trial court pointed out:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Minnesota v. Dickerson*, 508 U.S. 366, 375-376, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

**{¶30}** Where reasonable suspicion justifying a weapons frisk rises to probable cause due to the observations gained from the officer's sense of touch, a seizure of the contraband is warranted. *Id.* at 375. The probabilities to be considered are the "factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Moore*, 90 Ohio St.3d at 51, quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (on probable cause).

**{¶31}** Here, the deputy had just awakened the occupants of a vehicle parked on the side of the road facing oncoming traffic. He removed from the driver's seat a female who had been sleeping with a meth pipe sticking out of her bra; as the deputy pulled the meth pipe from her bra, a long line of saliva stretched from the pipe and she appeared woozy. Appellant was in the passenger seat. Against orders, Appellant seemed to remove his hands from the dashboard, as if attempting to hide something. As Appellant alighted from the car, the deputy observed a sawed-off shotgun between the passenger seat and door within Appellant's easy grasp. The deputy worried about a second weapon due to the drug indicators and the sawed-off shotgun. During the frisk, the deputy could feel there was a large amount of a substance in a baggie in Appellant's pants pocket. Under the circumstances, it would be reasonable to believe the powder in a baggie was probably drugs.

**{¶32}** We recognize it is not immediately apparent a lump is contraband if an officer determined by touch that a pocket does not contain a weapon and then had to further manipulate the lump in order to develop probable cause that it was contraband. *Dickerson*, 508 U.S. at 378. On this topic, we note the body cam video shows that after the initial patting of the lump in the front pocket, the officer pulled at the top of the pocket. Still, there was no indication one could see into the pocket, and he quickly released the pocket. He then continued patting the object. Yet, by this point, he was already asking if

it was dope. As the trial court pointed out, the deputy's mid-pat-down question as to whether the bulge was dope was immediately followed by the deputy's own observation that it felt like dope, confirming he already knew the answer to his question when he asked it. The trial court believed the deputy's testimony, "through my training and experience, I felt what appeared to be a foreign substance, like a narcotic, a pretty large bag. * * * I knew it was a narcotic." Factual questions at a suppression hearing are left to the trial court's sound discretion. Regardless of the applicability of the plain feel exception, there is the issue of Appellant's inevitable arrest for reasons preexisting the frisk.

{¶33} As the state points out, *the deputy had probable cause to arrest Appellant for a felony before the frisk*. This was based on Appellant's constructive possession of a sawed-off shotgun, which is a dangerous ordnance. The deputy testified he would have eventually placed Appellant under arrest for unlawful possession of a dangerous ordnance even if no drugs were found during the pat-down.

{¶34} Under the search incident to arrest exception to the warrant requirement, an officer who lawfully arrests a suspect is permitted to perform a warrantless search of suspect's person (and the area within his immediate control). *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 182, citing *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This exception recognizes the need to protect arresting officers and the interest in safeguarding evidence the arrestee could otherwise conceal or destroy. *Id.*, citing *Arizona v. Gant*, 556 U.S. 332, 339, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). In fact, "[t]he justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." *United States v. Robinson*, 414 U.S. 218, 234, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

{¶35} Where a defendant pointed out he was handcuffed at the time of the search, the Ohio Supreme Court pointed out "the right to search incident to arrest exists even if the item is no longer accessible to the arrestee at the time of the search." *Adams*, 144 Ohio St.3d 429 at ¶ 182. "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Robinson*, 414 U.S. at 235.

**{¶36}** Notably, the formal arrest need not precede the search as long as the arrest followed soon after the challenged search of the detainee's person and the fruits of the search are not part of the probable cause for the arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The key is not whether an arrest took place but whether probable cause supported an arrest prior to the search and whether an arrest followed the search without delay. *Id.*

**{¶37}** In sum, after viewing the gun, the deputy was clearly permitted to lawfully arrest Appellant for unlawful possession of a dangerous ordnance and conduct a search incident to arrest, which would include the pockets of the pants he was wearing. Appellant was arrested without delay after the frisk. Therefore, the drugs were not subject to suppression. The deputy would have discovered the drugs incident to Appellant's arrest without Appellant's answer about dope during the frisk.[2] Accordingly, we overrule Appellant's suppression arguments on his pre-*Miranda* statement and the methamphetamine recovered from his pocket.

**{¶38}** As to post-*Miranda* statements, Appellant argues his statements after being read his rights should be suppressed on the basis that he did not understand the *Miranda* rights recited by the deputy during the pat-down. Although Appellant does not specify the particular statements he wishes to be suppressed, we note this argument would apply to statements such as the baggie in his pocket did not contain fentanyl and the gun was left in the car by an individual who was in the car previously. (Tr. 126, 129). As the drugs were ruled admissible above, the non-fentanyl statement was not prejudicial; Appellant's possession of meth was clear where the drugs were in the pocket of the pants he was wearing. Appellant's allegation that the gun belonged to someone else may indicate Appellant's awareness of the gun (or it may merely indicate he assumed the other person left it in the car). Regardless, he already said the gun was not loaded, which was properly

---

[2] The state also refers to an inventory search of an arrestee's pocket. *Illinois v. Lafayette*, 462 U.S. 640, 648, 77 L.Ed.2d 65, 103 S.Ct. 2605 (1983) (police can search any container or article in possession of arrestee prior to incarcerating him in accordance with established inventory procedures). No inventory policy was mentioned at the suppression hearing. Still, the drugs were in a clear baggie in Appellant's pants pockets; no purse or container had to be opened. As the search incident to arrest doctrine typically precedes the consideration of the inventory doctrine, we focus on the clearly applicable preliminary doctrine. *See id.* at 645-646.

admitted as discussed supra; this clearly demonstrated his awareness of the gun and its particular condition. Considering the facts of this case, we conclude the post-*Miranda* statements were not shown to have prejudiced Appellant.

**{¶39}** In any event, the preponderance of the evidence showed a valid waiver of his rights after his *Miranda* rights were recited. Where a suppression motion challenges a *Miranda* waiver, the state has the burden to show by a preponderance of the evidence that the suspect knowingly, intelligently, and voluntarily waived his rights. *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 23, citing *Miranda*, 384 U.S. at 475. The court examines the totality of the circumstances, which may include: background and criminal experience; age, education, and intelligence; capacity and ability to understand the rights and the consequences of waiving those rights; the details of the interview (including length, intensity, and frequency); and the existence of deprivation, mistreatment, threat, or inducement. *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 9. A defendant's mental condition alone will not result in a finding of an involuntary *Miranda* waiver where there was no official coercion or overreaching. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 190.

**{¶40}** After Appellant said the bulge was dope, the deputy said he was going to read Appellant his rights so he could ask more questions before he touched the potentially dangerous drugs and then recited the *Miranda* warning to Appellant. Appellant loudly said, "Fuck." When the deputy asked if Appellant understood the rights, Appellant said, "What was that?" The deputy repeated his question about whether Appellant understood his rights, and Appellant groaned. The deputy said Appellant appeared to make these replies out of frustration with the situation; the deputy testified he had no reason to believe Appellant did not understand his rights. (Supp.Tr. 22). Notably, the deputy asked a third time if Appellant understood the rights read to him, explaining he was reading the rights so he could ask about the specific drug as he worried about fentanyl exposure. Appellant responded, "it's not fentanyl." (St.Ex. 3).

**{¶41}** An express statement of waiver is not necessary as waiver can be inferred from the actions and words of the person interrogated. *State v. Kalna*, 7th Dist. Mahoning No. 18 MA 0133, 2020-Ohio-5016, ¶ 30-31, citing *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 175, 560 L.Ed.2d 286 (1979) and *Ford*, 158 Ohio St.3d 139 at ¶ 188. Moreover, "*Miranda* does not require a police officer to specifically ask and receive a

direct response on whether a suspect understands his or her rights." *Id.* at ¶ 28, citing *Lather*, 110 Ohio St.3d 270 at ¶ 13.

**{¶42}** In arguing the evidence showed he did not understand his rights, Appellant emphasizes the following parts of the deputy's testimony: the occupants of the vehicle appeared to be passed out; he woke them by calling to them and knocking; when they awoke, they seemed confused as to their location; and the deputy believed they were under the influence of a substance. (Supp.Tr. 9-10, 12). The deputy also said Appellant later told him he used meth earlier. (Supp.Tr. 23).[3]

**{¶43}** However, it was 9:30 a.m. when the officer approached the vehicle to wake the occupants, and Appellant did not indicate when he used meth (or when they stopped the car to sleep). The body-cam video shows the occupants responded fairly quickly to the deputy's knocking (three fast knocks in a row, not three separate incidents of knocking). Appellant immediately placed his hands on the dashboard when the deputy instructed him to do so. Although he may have thereafter moved his hands abruptly, this did not show a lack of understanding (but more likely showed an attempt to hide something). When the deputy motioned for him to unlock the car door, Appellant did so with one hand while leaving the other hand on the dashboard, which shows his awareness of the importance of the situation.

**{¶44}** Upon exiting the vehicle, Appellant followed instructions and did not appear to be in a state of incomprehension. His gait, balance, and gaze seemed steady (especially in comparison to the female). The deputy indicated Appellant's speech was not slurred and his eyes were not red. Appellant was not young (nearly 34 years old). Appellant's prior experience with the criminal justice system was revealed by the indictment for having a weapon while under disability. There was no indication Appellant's replies were not voluntary; there was no coercion, threat, deprivation, mistreatment, or inducement. The subsequent questioning was brief and mostly conducted roadside for reasons of safety or identification. *See Lather*, 110 Ohio St.3d 270 at ¶ 9 (listing these factors). Under these circumstances, we conclude the preponderance of the evidence showed Appellant's waiver of his *Miranda* rights was valid. This assignment of error is overruled.

---

[3] We note this statement from the suppression hearing was not disclosed at trial.

ASSIGNMENT OF ERROR TWO:  SUFFICIENCY & WEIGHT

{¶45} Appellant's second assignment addresses two different legal doctrines, contending:

"APPELLANT'S CONVICTIONS FOR UNLAWFUL POSSESSION OF A FIREARM AND POSSESSION OF A FIREARM UNDER A DISABILITY ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶46} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if taken as true.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001).  In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring).  In reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution to ascertain whether some rational juror could have found the elements of the offense proven beyond a reasonable doubt.  *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998).

{¶47}  The elements of having a weapon while under disability are to "knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."  R.C. 2923.13(A)(3) ("[u]nless relieved from disability"), (B) (third-degree felony).  The parties stipulated Appellant was under indictment for felony possession of drugs in Summit County at the time of his arrest in this case.  (Tr. 4, 104, 176).

{¶48}  The elements of unlawful possession of a dangerous ordnance are to "knowingly acquire, have, carry, or use any dangerous ordnance."  R.C. 2923.17(A), (D) (fifth-degree felony).  The definition of dangerous ordnance includes a "sawed-off firearm."  R.C. 2923.11(K)(1).  *See also* R.C. 2923.11(L)(5) (excluding "a dangerous ordnance that is inoperable or inert and cannot readily be rendered operable or activated, and that is kept as a trophy, souvenir, curio, or museum piece").  A sawed-off firearm is

"a shotgun with a barrel less than eighteen inches long, or a rifle with a barrel less than sixteen inches long, or a shotgun or rifle less than twenty-six inches long overall." R.C. 2923.11(F).

{¶49} In the first part of this assignment of error, Appellant contests whether the state sufficiently demonstrated the gun was operable. He claims it was mere speculation to find the weapon could have fired a live round. Without claiming there was supporting evidence or suggesting this was the case here, Appellant provides an example situation, claiming a gun could contain a firing pin from a different brand of gun so that it appears to be operable during a dry-fire but would not precisely align to fire a live round.

{¶50} A firearm is defined as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant * * * includ[ing] an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(A) (applicable to R.C. 2923.11 to 2923.24), (B)(1). Clearly, an unloaded firearm meets the definition of a firearm, and Appellant does not argue otherwise.

{¶51} "When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm." R.C. 2923.11(B)(2). Thus, when a gun is not recovered, the state can use circumstantial evidence of operability. *See State v. Murphy*, 49 Ohio St.3d 206, 209, 551 N.E.2d 932 (1990) ("To require the state to produce the actual firearm or empirical evidence would frustrate the intent of the General Assembly."). The statutory reference to circumstantial evidence is not limited to cases where a gun was never recovered; rather, it generally applies in all cases involving the definition of a firearm. *See* R.C. 2923.11 (definitions as used in R.C. 2923.11 to 2923.24). Therefore, direct evidence through the test firing of a live round is not legally mandated, especially where to do so would be considered unsafe. *See, e.g., State v. Coleman*, 2d Dist. Montgomery No. 27702, 2018-Ohio-2214, ¶ 37 (where the detective testified a test-fire would be dangerous); *State v. Tillman*, 6th Dist. Fulton No. F-11-006, 2012-Ohio-5265, ¶ 15 (where an officer testified he unloaded the recovered gun, pulled the trigger, and observed the firing pin was working properly).

{**¶52**} Most notably, the Supreme Court has concluded that although operability (or capacity to be readily rendered operable) must be established by the state, "proof of the existence of a firearm may be based on lay testimony, and is not dependent on an empirical analysis of the gun." *Murphy*, 49 Ohio St.3d at 209, modifying *State v. Gaines*, 46 Ohio St.3d 65, 545 N.E.2d 68 (1989). We additionally point out the *Gaines* case relied on the former, stricter rule of circumstantial evidence. *Gaines*, 46 Ohio St.3d 72, citing *State v. Kulig*, 37 Ohio St.2d 157, 309 N.E.2d 897 (1972). Currently, "when the state relies on circumstantial evidence to prove an element of the offense charged, there is no requirement that the evidence must be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenk*s, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), overruling *Kulig*, 37 Ohio St.2d 157. Rather, circumstantial evidence inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001).

{**¶53**} A shotgun with 12 inches of barrel (with a curve handle, adding only another 6 inches or so) was prominently located in the space between the front passenger seat and the passenger door. Appellant was in that passenger seat. Appellant told the deputy the gun was not loaded, without claiming it was inoperable. (Tr. 129, 136-137). Photographs of the gun (with and without a tape measure) were admitted into evidence. (St.Ex. 4 & 5). As the deputy explained, the shotgun had a trigger, a hammer, and an intact firing pin. He considered it unsafe to attempt to test fire the shotgun with a live round due to the sawed-off barrel (and what he believed was a pistol grip modification). He conducted a "dry fire," cocking the hammer, pulling the trigger, and noticing the firing pin released as expected.[4] (Tr. 135-137).

{**¶54**} In conducting our sufficiency review, all of the evidence is to be considered in the light most favorable to the prosecution, including reasonable inferences. *State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The question is merely whether "any" rational trier of fact could have found the contested elements were adequately

---

[4] Even in a case where a gun lacked a firing pin, the Eighth District found sufficient evidence the gun could readily be rendered operable. *State v. Stubblefield*, 8th Dist. No. 90687, 2008-Ohio-5348, ¶ 7-10 (recovered firearm was lacking a firing pin, but the police officer test-fired it with an unrelated firing pin and testified to the ease of sliding in a firing pin).

established. *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson*, 443 U.S. at 319. Considering the totality of the circumstances, some rational juror could conclude the shotgun satisfied the definition of a firearm based upon the totality of the circumstances indicating operability.

{¶55} The remaining elements of the weapons offenses are not contested, but we nevertheless observe the state presented sufficient evidence of all elements of unlawful possession of a dangerous ordnance in violation of R.C. 2923.17(A) and having a weapon while under disability in violation of R.C. 2923.13(A)(3). Notably, a person can "have" an object through immediate physical possession or constructive possession, which involves dominion and control. *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976). "Ownership does not need to be proven and circumstantial evidence can be relied upon to establish constructive possession." *State v. Floyd*, 7th Dist. Mahoning No. 18 MA 0106, 2019-Ohio-4878, ¶ 16. A rational juror could find Appellant knowingly possessed a firearm, which was a type of dangerous ordnance due to the fact the shotgun's measurements placed it in the category of a sawed-off firearm.

{¶56} Appellant next states that even if the evidence of operability was sufficient, the jury lost its way in weighing the evidence on this element. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The court evaluates the effect of the evidence in inducing belief, but weight of the evidence is not a question of mathematics. *Id.* A weight of the evidence review considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the burden of production involved in a sufficiency review).

{¶57} When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. Where a case is tried by a jury, only a unanimous appellate panel can reverse on manifest weight of the evidence grounds. Ohio Constitution, Article IV, Section 3(B)(3). The power of the court of appeals to sit as the

"thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins*, 78 Ohio St.3d at 389.

{¶58} We incorporate the evidence reviewed supra on the sufficiency of the evidence as to operability. We emphasize the deputy's testimony opining it would be unsafe for him to test fire the sawed-off shotgun using a live round. The jury heard this testimony and his testimony on the dry-fire results and viewed photographs of the gun. They could additionally consider the fact Appellant had over 25 grams of meth in his pocket and the location of the gun was within an easy movement of his hand. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Reviewing the entire record, we cannot conclude the jury clearly lost its way in evaluating the evidence as to the shotgun's qualification as a firearm or as to the other uncontested elements. This assignment of error is overruled.

{¶59} For the foregoing reasons, Appellant's convictions are affirmed.


D'Apolito, P. J., concurs.

Hanni, J.concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**