[Cite as *State v. Endicott*, 2026-Ohio-2215.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

CHRISTOPHER R. ENDICOTT,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 26 BE 0005

---

Criminal Appeal from the
Belmont County Court, Eastern Division
of Belmont County, Ohio
Case No. 25CRB00570E

**BEFORE:**
Carol Ann Robb, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed, Reversed, and Modified.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecutor*, Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Ronald Perdue*, *Atty. Robert T. McDowall Jr.,* for Defendant-Appellant.

Dated:  June 11, 2026

**Robb, J.**

**{¶1}** Defendant-Appellant Christopher R. Endicott appeals after pleading no contest to two counts in the Belmont County Court, Eastern Division. First, Appellant contends the trial court erred in denying his suppression motion, claiming the record fails to demonstrate the traffic stop was supported by reasonable suspicion of a muffler offense regarding the vehicle in which he was a passenger. This argument is without merit.

**{¶2}** Second, Appellant challenges the trial court's nunc pro tunc entry imposing a sentence on count two exceeding the statutory maximum sentence for a second-degree misdemeanor. This argument has merit, and there are other issues with the nunc pro tunc entry as well.

**{¶3}** For the following reasons, the suppression decision is upheld, and thus, the convictions are affirmed. However, the nunc pro tunc sentencing entry is vacated, and the original judgment reflecting the sentence imposed at the sentencing hearing is hereby revived as the final sentencing entry.

<u>STATEMENT OF THE CASE</u>

**{¶4}** On October 3, 2025 at 2:20 p.m., a Bridgeport police officer initiated a traffic stop for a defective muffler. Appellant was the backseat passenger. The officer noted this type of stop was not an unusual occurrence during his work shift. (Supp.Tr. 5-6). The officer described hearing a "loud, excessive noise" and opined the muffler or exhaust was "defective by making a loud emitted noise." *Id.* at 5, 20-21. He testified to hearing the sound from inside his cruiser with the windows rolled up. *Id.* at 21. When the officer was questioned whether the vehicle had a muffler, he said, "I don't believe so" while indicating the danger in getting down on the ground (to see if the part was missing or damaged) while parked on the side of a busy road (shown on the video to be a freeway). *Id.* at 20, 58-59.

**{¶5}** As the sound on the officer's body cam only activated as he was alighting from his cruiser, the video did not capture the noise infraction giving rise to the stop (while the car was driving/accelerating). *Id.* at 9. However, a fairly loud and unhealthy rumbling and chugging sound can be heard on the video when the sound recording activated and was especially noticeable while the officer was initially speaking to the vehicle occupants.

<u>Case No. 26 BE 0005</u>

Notably, after two minutes, while the officer was taking down the driver's Social Security number, the front seat passenger reached over and shut off the engine, causing a sharp decrease in background noise. (Video at 14:22:15).

**{¶6}** While the officer was collecting information, the driver said his physical license was in the mail and he did not bring the temporary paper license with him. While the driver was looking for a copy of his insurance card on his phone (stating the insurance card was also in the mail), the officer asked where they were going. In response, the front seat passenger said they were hanging out and then started talking very fast about frozen drinks at a convenience store.

**{¶7}** After obtaining information on the occupants' identities, the officer returned to his cruiser to check the information on his computer system. According to an entry in the system, drug paraphernalia was recently recovered from the same vehicle, and the officer sought confirmation from dispatch, who verified this occurred the prior week. (Supp.Tr. 6, 31, 35). It was relayed to the officer the car had been towed because the driver-owner did not have a valid driver's license, while also confirming his license was since reinstated.

**{¶8}** As the officer wished to have the occupants alight from the vehicle, he summoned his supervisor for backup and assistance. *Id.* at 11, 33. In the meantime, under his standard practice,[1] he had the driver exit the vehicle to speak with him. The officer testified the driver gave conflicting answers about where he lived (Steubenville, then Beech Bottom in West Virginia, then Steubenville). *Id.* at 12-13. He said he was coming from a friend's house on Wheeling Island. The officer emphasized how the driver would look back at the vehicle when asked about illegal items, which he learned during training was a suspicious indicator (of possession); the driver also changed from stating there was nothing in his car to stating there should not be anything in his car *Id.* at 13-

---

[1] Once a valid investigatory stop is made, the temporarily detention of a vehicle containing a driver and passengers is not generally considered to be custodial, and the officer can order the driver and passengers out of the vehicle to complete the traffic stop without further suspicion. *State v. Anderson*, 2023-Ohio-945, ¶ 20-21 (7th Dist.), citing *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984) and *Maryland v. Wilson*, 519 U.S. 408, 413-415 (1997); *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (during a lawful roadside stop, the temporary seizure of driver and passengers remains reasonable for the duration of the stop due to officer's need to control the scene, and officer can ask passenger questions unrelated to the justification for the traffic stop, such as gang affiliation, without reasonable suspicion of criminal acts).

15, 54.  Another indicator to the officer was a perceived shift in the driver's demeanor from open to guarded with less eye contact.  *Id.* at 14-15.

**{¶9}**  The officer returned to his cruiser and started writing the citation for the loud exhaust when his supervisor arrived.  *Id.* at 15-16.  The officer then summoned the front seat passenger from the vehicle.  This passenger was free with information, saying he was on parole while denying any drug use or possession.  When asked about the backseat passenger, he said he had been friends with Appellant for years, provided Appellant's address, and said Appellant and the driver became friends a month ago.  This passenger announced Appellant had a prior drug history and then noted he did not think Appellant was still using drugs.  *Id.* at 18-19.

**{¶10}**  The officer then conversed with Appellant, who can be observed on the video hesitating before his answers.  He said he lived on Wheeling Island and claimed he did not know the driver (saying he just met him).  *Id.* at 19, 52.  Appellant acknowledged he had a needle and a glass pipe in his waistband.  *Id.* at 19-20.  Appellant was placed under arrest and loaded into the cruiser.

**{¶11}**  A drug dog had been summoned but was not employed since Appellant had already admitted to possessing drug abuse instruments.  The officer searched Appellant's backpack and found a baggie of suspected methamphetamine (meth).

**{¶12}**  After being read his *Miranda* rights, Appellant acknowledged the baggie contained "resin" and admitted it was meth.  When the officer noted there was enough "resin" for another dose, Appellant became upset (in a sad, not angry, manner).  (Video). The officer decided to issue the driver a verbal warning for the defective muffler.  *Id.* at 19, 44.

**{¶13}**  At Appellant's initial appearance, in setting bond, it was anticipated a complaint would be filed containing a felony charge due to possession of meth being one of the grounds for arrest.  (10/7/25 J.E.).  Instead, later that day, the officer filed a complaint charging Appellant with only misdemeanors.  The first count alleged attempted drug possession (meth), a first-degree misdemeanor.  *See* R.C. 2925.11(A),(C)(1)(a) (aggravated drug possession, schedule II including meth, as starting as fifth-degree felony); R.C. 2923.02 (A),(E)(1) (next lesser degree of offense attempted).  The second

count alleged with possession of drug abuse instruments (hypodermic or syringe), a second-degree misdemeanor.  *See* R.C. 2925.12(A),(C).

**{¶14}** Appellant filed a motion to suppress.[2]  In pertinent part, the motion alleged a lack of reasonable suspicion for the traffic stop.  (10/29/25 Mot.); (Supp.Tr. 3) (reiterating reasonable suspicion for the traffic stop as one of the issues for the hearing).  At the suppression hearing, the arresting officer testified about the stop, and the video from his body cam was played for the court.  Relevant to the issue on appeal, defense counsel argued the stop was invalid (and theorized the stop was pretextual).  He noted the officer did not conduct a decibel test or check to see if the vehicle had a muffler.  The court overruled the motion to suppress.  (12/10/25 J.E.).

**{¶15}** On December 22, 2025, Appellant pled no contest to both counts, and the court sentenced Appellant to consecutive ninety-day jail terms (with subsequent entries reserved for discussion where raised in the second assignment of error).  The within timely appeal followed.

ASSIGNMENT OF ERROR ONE

**{¶16}** Appellant's first assignment of error contends:

"The trial court erred in denying Endicott's motion to suppress because the officer lacked reasonable suspicion to conduct a traffic stop."

**{¶17}** We review the trial court's decision on a motion to suppress under a mixed standard of review.  *State v. Turner*, 2020-Ohio-6773, ¶ 14.  Factual determinations are upheld if supported by competent, credible evidence.  *Id.*  The trial court occupies the best position from which to evaluate the evidence and weigh the credibility of witnesses.  *State v. Mayl*, 2005-Ohio-4629, ¶ 41.  Legal questions are reviewed de novo.  *Turner* at ¶ 14.  We thus make an independent determination as to whether the facts satisfied the relevant legal standard.  *Mayl* at ¶ 41.

**{¶18}** In general, a police officer may conduct an investigatory stop and detention without probable cause when the officer has reasonable suspicion of a criminal (including traffic) violation.  *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968); *State v. Mays*, 2008-Ohio-4539, ¶ 8, 13; *see also State v. Tidwell*, 2021-Ohio-2072, ¶ 19-21.  Requiring less than probable

---

[2] Appellant then violated the terms of his bond by failing to appear for a pretrial, and a bench warrant was issued.  (10/9/25 J.E.; 10/30/25 J.E.; 11/17/25 J.E.).

cause but more than an inchoate hunch, the reasonable suspicion test looks at the articulable facts and any rational inferences to be derived from those facts in their entirety to ascertain if there exists a particularized suspicion. *Terry* at 21, 27; *State v. Batchili*, 2007-Ohio-2204, ¶ 17-19. *Compare Texas v. Brown*, 460 U.S. 730, 742 (1983) (even the greater test of probable cause is a flexible, common-sense standard merely requiring the facts available to the officer to lead a person of reasonable caution to believe some offense was committed without requiring a showing of correctness or more likely than not).

**{¶19}** In conducting the analysis, a court does not weigh the evidence through the lens of a legal expert's scholarly analysis but through the viewpoint of a trained law enforcement officer. *United States v. Cortez*, 449 U.S. 411, 418 (1981). Moreover, an evaluation of the totality of circumstances means the court need not determine whether each circumstance or factor would be suspicious on its own, as any relevant factors are assembled together and considered as a collection. *Id.*; *Mays* at ¶ 12, citing *Batchili* at ¶ 19.

**{¶20}** Additionally, "an officer need not artfully articulate his justifications as we view the evidence in the record regarding the specific facts the officer stated that he had before him." *State v. Koczwara*, 2014-Ohio-1946, ¶ 16 (7th Dist.). The officer's subjective motivation for a stop is irrelevant. *Dayton v. Erickson*, 76 Ohio St.3d 3, 6 (1996); *Koczwara* at ¶ 20-22 (officer's ulterior motives do not invalidate otherwise permissible police conduct; order to step out of the stopped vehicle is not a seizure separate from the original stop requiring additional justification), citing *Whren v. United States*, 517 U.S. 806, 812 (1996) and *State v. Evans*, 67 Ohio St.3d 405, 408 (1993).

**{¶21}** When defense counsel questioned the officer as to whether he stopped the driver for violating the state law or a Bridgeport ordinance, the officer referred to an ordinance prohibiting a defective muffler or a certain amount of noise. (Supp.Tr. 21). (or smoke). As Appellant was not the driver or owner of the vehicle stopped, the complaint filed against him did not contain the elements of the loud muffler offense for which the vehicle was stopped. Appellant's brief states a search of "publicly available" municipal codes was not productive in looking (presumably online) for a copy of the Bridgeport loud

muffler ordinance in order to ascertain the elements besides what the officer mentioned in his testimony.

**{¶22}** We point out, under state law, the clerk of the legislative authority of a municipal corporation is one of various sources for the village's ordinances. R.C. 731.21(B) (ordinances "may be obtained or viewed at the office of the clerk of the legislative authority of the municipal corporation and may be viewed at any other location designated by the legislative authority of the municipal corporation"), (C) (the clerk of the legislative authority shall post ordinances and supply copies on request for a fee); R.C. 731.23 ("When ordinances are revised, codified, rearranged, published in book form, and certified as correct by the clerk of the legislative authority of a municipal corporation and the mayor, such publication shall be a sufficient publication"); *see also* R.C. 703.01(A) (a village is a municipal corporation with a population of less than 5,000 eligible registrants).

**{¶23}** The trial court was permitted to take judicial notice of municipal ordinances within its own territorial jurisdiction regardless of whether a party provided advance notice or request. Crim.R. 27, citing Civ.R. 44.1. "The court in taking judicial notice of a municipal ordinance . . . within this state may inform itself in such manner as it deems proper . . ." Civ.R. 44.1 (A)(2). *Compare* Evid.R. 201 (governing judicial notice of adjudicative facts).

**{¶24}** Likewise, the appellate court may take judicial notice of an ordinance necessarily applied by the trial court. *See City of Cleveland v. Keah*, 157 Ohio St. 331, 335-36 (1952) ("Doubtless, the Municipal Court took judicial notice of all the ordinances of the city of Cleveland which had any direct bearing on the cause before it . . . the appellate courts will likewise take such judicial notice"). In accordance, we have obtained Bridgeport Codified Ordinance 438.21, which deals with mufflers.

**{¶25}** The language of the Bridgeport muffler ordinance mirrors and contains a citation to the corresponding state statute. *Compare* R.C. 4513.22 *with* Bridgeport Cod.Ord. 438.21.[3] In any event, "Judicial notice shall be taken of the . . . public statutory

---

[3] In addition to prohibiting a defective muffler that causes excessive or unusual noise, both the state statute and the local ordinance also contain a section on exhaust smoke, as mentioned in the officer's testimony. R.C. 4513.22(A); Bridgeport Cod.Ord. 438.21(a)(2); *see also* Bridgeport Cod.Ord. 648.045(b)(3) (unreasonably make noise disturbance), (b)(3) (including by operating a motor vehicle not equipped with a stock muffler system or another sound dissipative device in good working order and in constant operation), (e) (minor misdemeanor unless persists after reasonable warning).

law of this state." Civ.R. 44.1(A)(1) (via Crim.R. 27); *see also Lawyers Coop. Publishing Co. v. Muething*, 65 Ohio St.3d 273, 275-276 (1992) (agreeing an appellate court has power to consider all available state statutes).

**{¶26}** As Appellant's brief recognizes, the state statute prohibits driving a vehicle with a defective muffler as follows: "Every motor vehicle . . . shall at all times be equipped with a muffler which is in good working order and in constant operation to prevent excessive or unusual noise, and no person shall use a muffler cutout, by-pass, or similar device upon a motor vehicle on a highway." R.C. 4513.22(A); *accord* Bridgeport Cod.Ord. 438.21(a)(1). This offense is a minor misdemeanor. R.C. 4513.22(B); *accord* Bridgeport Cod.Ord. 438.21(b).

**{¶27}** Where a trooper testified at the suppression hearing that he thought an exhaust system was excessively loud because he could hear it in his cruiser with the windows rolled up and the air conditioning running, we found reasonable suspicion to initiate a traffic stop. *State v. Snyder*, 2004-Ohio-3200, ¶ 5 (7th Dist.). We explained the lack of audio on the video (due to a recording flaw) did not mean the state lacked proof at the suppression hearing. *Id.*

**{¶28}** Where the testifying officer thought the exhaust system was excessively loud because he could hear it from three car lengths away, we concluded this was sufficient reasonable suspicion for the traffic stop. *State v. Howiler*, 2008-Ohio-1171, ¶ 24 (7th Dist.) (counsel was thus not ineffective by negotiating a guilty plea, which failed to preserve the issue of reasonable suspicion for the traffic stop).

**{¶29}** "Essentially, appellant is contesting the officer's credibility as to whether the muffler noise was excessively loud." *State v. Cunningham*, 2009-Ohio-4394, ¶ 17 (7th Dist.). "Notably, this is not the place to determine if [the driver] was actually guilty of the noise violation. Rather, we are determining whether a reasonable person would find from all the facts and circumstances whether an investigatory stop was proper." *Id.* (upholding denial of suppression where the officer testified he heard a "very loud" muffler while inside his cruiser with the windows rolled up, saw the defendant's vehicle 100 feet away, rolled down his window, and heard a loud crack when the defendant accelerated).

**{¶30}** As recited in our Statement of the Case above, the officer testified to his belief the muffler or exhaust was "defective by making a loud emitted noise" described

further as a "loud, excessive noise." (Supp.Tr. 5, 20-21). He said he could hear the sound from inside his cruiser with the windows rolled up. Due to the character of the sound, he believed the vehicle lacked a muffler or at least lacked a functioning muffler. As emphasized by the Ohio Supreme Court, it was within the province of the trial court to believe the officer's testimony. *Mayl*, 2005-Ohio-4629, at ¶ 41.

{¶31} Moreover, although the noise prompting the stop was not captured on video, we can hear the abnormally loud idling on the seemingly defective exhaust system as the officer opens his door and while he was speaking to the driver. Apparently recognizing the loud and intrusive nature of the vehicle noise, the front seat passenger took it upon himself to reach over and turned off the driver's vehicle. This caused a sharply noticeable decrease in background noise, which suggests to the listener just how loud the exhaust was and further supports the officer's credibility.

{¶32} The trial court was presented with facts demonstrating the existence of a reasonable articulable suspicion that the vehicle was not "equipped with a muffler in good working order and in constant operation to prevent excessive or unusual noise" in violation the state statute or local ordinance, which was a minor misdemeanor. R.C. 4513.22(A),(B); *see also* Bridgeport Cod.Ord. 438.21(a)(1),(b). Competent, credible evidence supported a finding of reasonable suspicion to investigate the loud muffler traffic violation. *See Turner*, 2020-Ohio-6773, at ¶ 14.

{¶33} As the trial court pointed out, the officer's attention thereafter reasonably shifted from the loud exhaust investigation to other suspicions. The officer began writing the driver a citation for the violation, but after Appellant's arrest, the officer decided to issue a verbal warning to the driver. "The state does not have to charge a motorist with a traffic violation in order to use the facts of the traffic violation to support reasonable suspicion to initiate the traffic stop." *State v. Mihelarakis*, 2004-Ohio-3047, ¶ 12 (7th Dist.); *see also State v. Johnson*, 2017-Ohio-8909, ¶ 16 (2d Dist.) ("Although the officer did not actually issue a speeding ticket, he witnessed [the defendant] driving in excess of the posted speed limit, satisfying the reasonable suspicion standard"); *City of Marysville v. Creameans*, 1992 WL 14357, *2 (3d Dist. Jan. 27, 1992) ("The fact that the officer elected not to cite the appellant for the failure to signal his turn is of no importance" to the

reasonable suspicion justifying the stop).  The failure to issue a citation did not diminish the reasonable suspicion for the stop.  This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO

**{¶34}**  Appellant's second assignment of error provides:

"Endicott's sentence is contrary to law because the trial court imposed a 180-day jail sentence for a misdemeanor of the second degree, exceeding the statutory maximum."

**{¶35}**  At the sentencing hearing, the parties jointly recommended a sentence that would allow a suspension of the jail term while transferring Appellant to a named in-patient treatment program once a bed became available.  (Sent. Tr. 3-4).  Appellant urged, "I would rather go into treatment than to be released on the streets and you know, now that I have some clean time under my belt, you know, being incarcerated . . ." *Id.* at 4.  The court said if a bed at the treatment facility became available, the court would release him from jail and place him on probation, predicting the probation term in a future order would be five years with the first two years supervised.  *Id.* at 7-9.  The sentence announced at the sentencing hearing was 90 days in jail on each count to run consecutively for a total of 180 days with 45 days credit for time served.  *Id.* at 7.

**{¶36}**  The resulting sentencing entry recited:  "Defendant is sentenced to 90 days on each count, to run consecutive for a total of 180 days.  Defendant granted credit for 45 days previously served."  The entry also said Appellant was to be evaluated by the treatment facility and if deemed appropriate for treatment, the court shall be notified in order to release him from jail and to issue an entry to be forwarded to the appropriate agencies.  (12/30/25 J.E.).  Although this judgment is date-stamped December 30, 2025, the clerk's entry in the docket for the judgment uses the date December 22, 2025 (which was the date of the sentencing hearing and the date typed into the body of the entry to reflect the date of the proceedings).

**{¶37}**  The parties do not discuss an entry issued the day after the sentencing hearing.  This entry ordered Appellant released from jail to begin his treatment at the named facility, suspending the balance of his sentence, and placing him on supervised probation for two years.  This entry explained some of the terms of probation including good behavior, no violations of the law, contact probation officer immediately, pay $150

supervision fee, attend all court appearances, do not use alcohol, marijuana, or illegal drugs, and comply with all recommendations of the facility. He was instructed to immediately report back to jail if he was terminated from the program. (12/23/25 J.E.).

{¶38} On January 5, 2026, the trial court issued a "nunc pro tunc" sentencing entry. Corresponding to the nunc pro tunc label, the event docket contains no indication a hearing was held between the original sentencing hearing and this new sentencing entry. The language of the entry confirms the lack of a subsequent hearing by reiterating the same facts about the parties appearing before the court for a pretrial on December 22, 2025 where the court accepted Appellant's no contest plea to first-degree misdemeanor attempted possession of drugs and to second-degree misdemeanor possession of drug abuse instruments.

{¶39} This January 5 entry then *changed the imposed sentence, increasing the sentence to 180 days on each offense* (to run consecutively). Specifically, the court's new entry declared:

> On Count I, the Defendant is sentenced to 180 days in jail. However, the Defendant shall receive credit for 45 days previously served. The remaining 90 days shall be served in the Belmont County Jail commencing December 22, 2025 to March 22, 2026 at 9:00 a.m.

> On Count II, the Defendant is sentenced to 180 days in the Belmont County Jail commencing March 22, 2026 at 9:00 a.m. to September 18, 2026 at 9:00 am. Count II shall run consecutive to Count I.

(1/5/26 J.E.) (maintaining the instruction for a named facility to evaluate Appellant and notify the court if he was deemed appropriate for treatment so the court could issue an entry for his release from jail and forward it to the appropriate agencies).

{¶40} Appellant filed a timely appeal from the December 30, 2025 and the January 5, 2026 entries. On February 9, 2026, the trial court granted a stay of the jail sentence pending appeal. When the trial court later lifted the stay, we granted our own stay of the sentence. (4/14/26 J.E.).

{¶41} Appellant's brief emphasizes the sentence to 180 days in jail for count two exceeds the maximum available sentence for the second-degree misdemeanor. The state concedes the error. As a remedy, the state not only asks us to decrease the

sentence on count two but encourages us to decrease both sentences by reverting to the original sentence announced in open court on December 22, 2025 and journalized on December 30, 2025.

**{¶42}** Although a misdemeanor sentence is generally reviewed for an abuse of discretion, a de novo standard of review is employed when determining pure questions of law, including whether a statute prohibits a court from imposing a particular sentence. *State v. Ferrelli*, 2026-Ohio-750, ¶ 19 (7th Dist.). The abuse of discretion standard for ascertaining whether a trial court erred presupposes a court was permitted to exercise discretion on the matter at issue. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 37. As pointed out by the Ohio Supreme Court, "courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule." *Id.* at ¶ 39. It is "axiomatic: a court does not have discretion to misapply the law . . . That is why courts apply a de novo standard when reviewing issues of law." *Id.* at ¶ 38.

**{¶43}** Before addressing Appellant's argument on the second count in the nunc pro tunc entry, we must make an observation regarding the paragraph in the nunc pro tunc entry announcing the sentence on count one. This count, attempted drug possession (meth), was a first-degree misdemeanor for which the maximum sentence was 180 days. R.C. 2929.24(A)(1). However, as can be seen in the above block-quoted announcement of sentence, the paragraph in the nunc pro tunc entry related to the first count does not compute mathematically and contains an internal inconsistency (between the sentence specified in days and the sentence specified by dates).

**{¶44}** That is, 180 days with 45 days of jail time would leave 135 days remaining to serve, not the "remaining 90 days" (announced in the entry and then repeated by listing specific start and end dates spanning 90 days). In other words, if one were to use the numerical day-length of the sentence announced in the first portion of the paragraph on count one, the sentence would be 180 days minus 45 days with 135 days remaining to be served. Distinctly, if one were to use the specified calendar start and end dates spanning 90 days, the actual sentence to express would have been 135 days minus 45 days credit.

**{¶45}** Although the sentence on count one in the nunc pro tunc entry did not exceed the maximum, it is contained in multiple clauses in the same paragraph that

contradict each other. The issue cannot be corrected with a *future* nunc pro tunc entry because neither iteration contains the sentence imposed at the sentencing hearing. The nunc pro tunc entry the trial court issued is inherently problematic, which we further explain after discussing Appellant's argument on count two.

**{¶46}** As for count two, the trial court specifically recognized possession of drug abuse instruments was a misdemeanor of the second degree in both the December 30, 2025 and the January 5, 2026 sentencing entries. The maximum sentence for a second-degree misdemeanor is only 90 days. R.C. 2929.24(A)(2).[4] However, the court's nunc pro tunc entry imposed double the maximum allowable time for a second-degree misdemeanor.

**{¶47}** That is, the paragraph relevant to count two in the court's nunc pro tunc entry imposed "180 days in the Belmont County Jail" and ran the sentence consecutive to count one. In the same sentence, the court confirmed the intent to impose 180 days by specifying the sentence would run from March 22, 2026 to September 18, 2026.

**{¶48}** A court issuing a misdemeanor sentence may generally impose any sanction or combination of sanctions under R.C. 2929.24 to 2929.28 but is prohibited from imposing a sanction that is precluded by any provision of R.C. 2929.23 to 2929.28. R.C. 2929.22(A). The imposition of a sentence outside the statutory range is the classic example of a sentence that is contrary to law. *Ferrelli*, 2026-Ohio-750, at ¶ 22-23 (7th Dist.), citing *State v. Fischer*, 2010-Ohio-6238, ¶ 22-23 and *State v. Marcum*, 2016-Ohio-1002, ¶ 14; *see also State v. Sergent*, 2016-Ohio-2696, ¶ 26-31 (where the Supreme Court held a sentence outside the statutory range is contrary to law even if jointly recommended).

**{¶49}** In the recent *Ferrelli* case, we reversed this same division of the Belmont County Court for imposing a sentence exceeding the statutory maximum. *Ferrelli* at ¶ 1 (court lacked authority to impose probation on a minor misdemeanor). In doing so, we pointed to the Ohio Supreme Court's observation:

---

[4] Under the statute defining the offense in count two: "Whoever violates this section is guilty of possessing drug abuse instruments, a misdemeanor of the second degree. If the offender previously has been convicted of a drug abuse offense, a violation of this section is a misdemeanor of the first degree." R.C. 2925.12(C). On count two, the state agrees Appellant was only charged in the complaint with a second-degree misdemeanor and was only found guilty by the court of a second-degree misdemeanor.

judges are not imperial . . . authority to sentence in criminal cases is limited by the people through the Ohio Constitution and by our legislators through the Revised Code. Judges have no inherent power to create sentences . . . Rather, judges are duty-bound to apply sentencing laws as they are written . . . No court has the authority to impose a sentence that is contrary to law.

*Fischer* at ¶ 21-23. "In other words, a sentencing judge can only impose a sentence that is authorized by a statute and lacks authority to fabricate a sentence." *Ferrelli* at ¶ 17, citing *State v. Anderson*, 2015-Ohio-2089, ¶ 10-13 (where the Ohio Supreme Court emphasized a court may not exceed its statutory authority even if the particular sentence is not explicitly prohibited by a statute); *see also State v. Liason*, 2026-Ohio-243, ¶ 1 (7th Dist.) (where the trial court specified prison was required but then imposed a prison term below the statutory minimum, we ruled the sentence was contrary to law and modified the sentence to the statutory minimum).

{¶50} In sum, the imposition of 180 days on count two (consecutive to 180 days on count one) was contrary to law because it exceeded the statutory maximum sentence of 90 days for a second-degree misdemeanor. Accordingly, Appellant's second assignment of error has merit.

{¶51} Moreover and regardless, a nunc pro tunc entry cannot be utilized to change a sentence to one that was not imposed orally in open court. *State v. Bonnell*, 2014-Ohio-3177, ¶ 30-31. The Ohio Supreme Court explained, "a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Id.* at ¶ 30 ("But a nunc pro tunc entry cannot cure the failure to make the required findings at the time of imposing sentence."), citing *State v. Qualls*, 2012-Ohio-1111, ¶ 13 and *State v. Miller*, 2010-Ohio-5705, ¶ 16. "Clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission, may be corrected by the court at any time." Crim.R. 36.

{¶52} As pointed out by the Supreme Court, "an error corrected by a nunc pro tunc entry does not involve a legal decision or judgment," and this type of entry is possible because "courts possess the authority to correct an error in a judgment entry so that the record speaks the truth." *Qualls* at ¶ 13, citing *Miller* at ¶ 15 and *State v. Lester*, 2011-Ohio-5204, ¶ 18-19. "Although trial courts generally lack authority to reconsider their own

valid final judgments in criminal cases, they retain continuing jurisdiction to correct clerical errors in judgments by a nunc pro tunc entry to reflect what the court actually decided." *Id.* at ¶ 13, quoting *State ex rel. Womack v. Marsh*, 2011-Ohio-229, ¶ 13 (the court may correct the original sentencing entry to reflect the term actually imposed at sentencing without a new sentencing hearing if the failure "was manifestly a clerical error"), citing Crim.R. 36 and *State ex rel. Cruzado v. Zaleski*, 2006-Ohio-5795, ¶ 18-20 (where the Supreme Court explained if the adjusted error was not clerically made to reflect what occurred at the original sentencing hearing, then a trial court may only exercise jurisdiction to add to a sentence if the contested item rendered the sentence void, under former law, with resentencing on the missing item).

{¶53} Here, the trial court did not correct a clerical error via the January 5, 2026 "nunc pro tunc" entry, the original sentence was not void, and the January 5, 2026 entry cites only to the original sentencing with no indication a subsequent hearing was held (between the sentencing hearing and the nunc pro tunc entry).[5] As the trial court used a nunc pro tunc entry to increase a sentence by essentially claiming the increased sentence was imposed at the December 22, 2025 hearing, the entry must be vacated (on this basis as well due to the issues discussed above regarding an internally inconsistent sentence on count one and exceeding the maximum sentence on count two).

{¶54} The vacation of the January 6, 2026 nunc pro tunc entry reactivates the December 30, 2025 sentencing entry. In that entry, Appellant was sentenced to only 90 days on each count (consecutively, for a total of 180 days with 45 days credit for time served). The sentence on count one was half the maximum sentence, and the sentence

---

[5] As noted above, the parties do not mention the December 23, 2025 entry releasing Appellant to the in-patient treatment facility or the instruction to "immediately report back to the Belmont County Jail" if the program terminated him. If some situation occurred resulting in Appellant reporting back to jail to serve the sentence imposed at the December 22, 2025 hearing, this still would not grant the trial court authority to increase his prior sentence through a nunc pro tunc entry. We also note there is no indication on the record of a probation violation or further hearing prior to nunc pro tunc entry. In other words, we are not presented with an issue on the ramifications of imposing 90-day consecutive jail terms at the sentencing hearing with a later attempt to punish a probation violation by imposing a greater sentence than originally announced; i.e., the court termed the January 5, 2026 sentencing order a nunc pro tunc entry and specified that it resulted from the December 22, 2025 pretrial, plea, and sentencing hearing, not from some subsequent event. Post-sentencing-hearing behavior is not before this court, as this appeal derives from only the jail terms imposed at the sentencing hearing and the corresponding sentencing entry.

on count two did not exceed the statutory maximum. This sentencing entry aptly corresponded to the sentence announced at the sentencing hearing.

**{¶55}** Vacating the nunc pro tunc entry so as to reactivate the original sentencing entry corrects the error raised by Appellant on the sentence for count two in the nunc pro tunc entry exceeding the statutory maximum, fixes the issue with the internally inconsistent and mathematically incorrect sentence imposed on count one in the nunc pro tunc entry, and cures the improper issuance of a nunc pro tunc entry failing to reflect what actually occurred at the sentencing hearing. As mentioned above, this is the remedy recommended by the state in conceding the 180-day sentence on count two in the nunc pro tunc entry was contrary to law.

## CONCLUSION

**{¶56}** Appellant's first assignment of error is affirmed. The trial court did not err in overruling the suppression motion. Therefore, Appellant's convictions are affirmed.

**{¶57}** Appellant's second assignment of error has merit. The trial court's nunc pro tunc sentencing entry imposed a sentence on a second-degree misdemeanor that exceeded the statutory maximum. Furthermore, the sentence on count one in the nunc pro tunc entry was internally inconsistent and mathematically incorrect. Regardless, the court lacked authority to issue a nunc pro tunc entry that increased the jail terms resulting in a sentencing entry that no longer reflected what occurred at the sentencing hearing.

**{¶58}** Accordingly, the trial court's January 5, 2026 nunc pro tunc sentencing entry is vacated, leaving the revived December 30, 2025 sentencing entry as the governing judgment, which reflects the sentence imposed at the sentencing hearing.

**{¶59}** For the foregoing reasons, Appellant's convictions are affirmed, the nunc pro tunc sentencing entry is reversed, and the sentence is modified to its original terms in the entry dated December 30, 2025, consistent with this opinion.

Hanni, J., concurs.

Dickey, J. concurs.

Case No. 26 BE 0005

---

For the reasons stated in the Opinion rendered herein, the final judgment and order of this court is that the Appellant's convictions are affirmed, the nunc pro tunc sentencing entry is reversed, and the sentence is modified to its original terms in the entry dated December 30, 2025, according to law and consistent with this Court's Opinion. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**